# 25-2826-cv

## United States Court of Appeals
### *for the*
## Second Circuit

DAVID T. SILVA, GERROD T. SMITH, JONATHAN K. SMITH,
Members of the Shinnecock Indian Nation,

*Plaintiffs-Appellants,*

– v. –

BRIAN FARRISH, JAMIE GREENWOOD, EVAN LACZI, NEW YORK
STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION,
SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE, BASIL SEGGOS,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

Joseph Plumer
Riley Plumer
PLUMER LAW OFFICE
9352 N Grace Lake Road SE
Bemidji, Minnesota 56601
(218) 556-3824

*Attorneys for Plaintiffs-Appellants*

 COUNSEL PRESS    (800) 4-APPEAL • (390747)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT .............................................................5

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..................5

STATEMENT OF THE CASE .....................................................................7

    A. Legal Background ..............................................................................7

    B. Factual and Procedural Background ..................................................9

        1. Shinnecock Background and Fishing History ...............................9

        2. English Colonization of Eastern Long Island .............................10

        3. This Present Lawsuit....................................................................12

        4. Initial Rulings .............................................................................14

        5. This Court's Reversal ..................................................................15

        6. Remand Proceedings ...................................................................16

SUMMARY OF THE ARGUMENT ...........................................................19

STANDARD OF REVIEW ........................................................................21

ARGUMENT ..............................................................................................21

I.    The District Court Erred in Characterizing Plaintiffs' Remaining Claim as a Challenge to New York's American Eel Regulations ........................21

II.   Aboriginal Shinnecock Fishing Rights Are Fully Compatible and May Coexist with New York's Management of Natural Resources.................24

i

III. The Shinnecock Indian Nation Continues to Hold Aboriginal Fishing Rights in New York Waters That May Be Exercised By Its Members......29

    A. Aboriginal Shinnecock Fishing Rights Exist in New York Waters......29

        1. The Shinnecock's Long-Term Use and Occupancy of Long Island Waters Establishes Aboriginal Fishing Rights ....................30

        2. The Shinnecock Exclusively Used Long Island Waters ................35

IV. Aboriginal Shinnecock Fishing Rights Have Not Been Extinguished .....39

    A. The District Court Improperly Relied on *Shinnecock Indian Nation* to Imply the Extinguishment of Shinnecock Fishing Rights........................41

    B. No Colonial-Era Document Extinguished Aboriginal Shinnecock Fishing Rights .......................................................44

        1. Aboriginal Shinnecock Fishing Rights Do Not Depend on Title to Land or Waters....................................................44

        2. The Transfer of Land Title to Non-Indians Does Not Affect Underlying Aboriginal Rights.........................................47

        3. The 1640 Deed to Southampton Did Not Extinguish Shinnecock Fishing Rights .........................................................50

        4. Purported Land Sales to Individual Colonists From 1648 to 1662 Did Not Extinguish Shinnecock Fishing Rights ...........................51

        5. The 1666 Nicolls Determination, 1676 Andros Patent, and the 1686 Dongan Patents Did Not Extinguish Shinnecock Fishing Rights.................................................................52

        6. The 1703 Lease Did Not Extinguish Shinnecock Fishing Rights ..57

V. Alleged Equitable Defenses Do Not Extinguish Aboriginal Shinnecock Fishing Rights ...................................................................58

CONCLUSION ....................................................................59

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama-Coushatta Tribe of Texas v. United States*,
No. 3-83, 2000 WL 1013532 (Fed. Cl. June 19, 2000) ....................34, 35, 47

*Baldwin v. Fish & Game Comm'n of Mont.*,
436 U.S. 371 (1978) ................................................................20, 24, 25

*Behrens v. JPMorgan Chase Bank, N.A.*,
96 F.4th 202 (2d Cir. 2024) ...........................................................42

*Buttz v. N. Pac. R.R. Co.*,
119 U.S. 55 (1886) .......................................................................49

*Callahan v. Cty. of Suffolk*,
96 F.4th 362 (2d Cir. 2024) ...........................................................21

*Cayuga Indian Nation of N.Y. v. Seneca Cty.*,
978 F.3d 829 (2d Cir. 2020) ..........................................................58

*Chouteau v. Molony*,
57 U.S. (16 How.) 203 (1853) ........................................................49

*City of Sherrill v. Oneida Indian Nation*,
544 U.S. 197 (2005) .....................................................................58

*Cramer v. United States*,
261 U.S. 219 (1923) ..............................................................1, 8, 49

*Douglas v. Seacoast Products, Inc.*,
431 U.S. 265 (1977) .................................................................46, 47

*Fort Knox Music Inc. v. Baptiste*,
257 F.3d 108 (2d Cir. 2001) .......................................................3, 42

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .....................................................................10

*Herrera v. Wyoming*,
  587 U.S. 329 (2019) ...................................................................................20, 28

*Hoffler v. Bezio*,
  726 F.3d 144 (2d Cir. 2013) ...................................................................3

*Holden v. Joy*,
  84 U.S. 211 (1872) ...................................................................................7

*Hughes v. Oklahoma*,
  441 U.S. 322 (1979) ...........................................................................24, 25

*Hunt v. United States*,
  278 U.S. 96 (1928) ...................................................................................26

*Idaho v. Coeur d'Alene Tribe of Idaho*,
  521 U.S. 261 (1997) ...........................................................................15, 55

*In re Bernard L. Madoff Inv. Sec. LLC*,
  721 F.3d 54 (2d Cir. 2013) ...................................................................42

*Johnson v. M'Intosh*,
  21 U.S. (8 Wheat.) 543 (1823) ...........................................................7, 52

*Kennedy v. Becker*,
  241 U.S. 556 (1916) ...............................................................................27

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976) ...........................................................................2, 25

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*,
  700 F.2d 341 (7th Cir. 1983) ...............................................................24

*Lipan Apache Tribe v. United States*,
  180 Ct. Cl. 487 (Ct. Cl. 1967) ...........................................................51

*Martin v. Waddell's Lessee*,
  41 U.S. (16 Pet.) 367 (1842) ...............................................................55

iv

*Metlakatla Indian Cmty. v. Dunleavy*,
58 F.4th 1034 (9th Cir. 2023) ...............................................................28

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999) ...............................................................3, 24, 27, 28

*Missouri v. Holland*,
252 U.S. 416 (1920) ...............................................................2, 25

*Mitchel v. United States*,
34 U.S. (9 Pet.) 711 (1835)...............................................................8, 30

*Montana v. United States*,
450 U.S. 544 (1981) ...............................................................45

*Muckleshoot Tribe v. United States*,
3 Ind. Cl. Comm. 669 (1955) ...............................................................39

*Native Village of Eyak v. Blank*,
688 F.3d 619 (9th Cir. 2012) ...............................................................8, 29, 35

*New York v. Shinnecock Indian Nation*,
523 F. Supp. 2d 185 (E.D.N.Y. 2007),
*vacated*, 686 F.3d 133 (2d Cir. 2012) ...............................................................3, 6, 41, 42, 43

*New York v. Shinnecock Indian Nation*,
686 F.3d 133 (2d Cir. 2012) ...............................................................3, 6, 41, 42

*Oneida Cty. v. Oneida Indian Nation*,
470 U.S. 226 (1985) ...............................................................40

*Oneida Indian Nation v. New York*,
860 F.2d 1145 (2d Cir. 1988)...............................................................40

*Oneida Indian Nation v. Oneida Cty.*,
414 U.S. 661 (1974) ...............................................................40, 58

*Pac. Operators Offshore, LLP v. Valladolid*,
565 U.S. 207 (2012) ...............................................................45

*People v. Jondreau,*
185 N.W.2d 375 (Mich. 1971)..................................................................27

*People of Village of Gambell v. Clark,*
746 F.2d 572 (9th Cir. 1984) ...............................................................2, 8

*People of Village of Gambell v. Hodel,*
869 F.2d 1273 (9th Cir. 1989) ....................................................4, 21, 46

*PPL Mont., LLC v. Montana,*
565 U.S. 576 (2012) ...............................................................................55

*Pueblo of Jemez v. United States,*
790 F.3d 1143 (10th Cir. 2015)....................................4, 30, 45, 49, 51

*Puricelli v. Republic of Argentina,*
797 F.3d 213 (2d Cir. 2015) ..................................................................22

*Sac & Fox Tribe of Indians of Okla. v. United States,*
383 F.2d 991 (Ct. Cl. 1967),
*cert. denied,* 389 U.S. 900 (1967) .....................................4, 20, 29, 30, 44, 57

*Shively v. Bowlby,*
152 U.S. 1 (1894) ...................................................................................26

*Silva v. Farrish,*
47 F.4th 78 (2d Cir. 2022) .............................................................*passim*

*Snake or Piute Indians v. United States,*
112 F. Supp. 543 (Ct. Cl. 1953)............................................................35

*Sompo Japan Ins. Co. of Am. v. Norfolk S. R.R. Co.,*
762 F.3d 165 (2d Cir. 2014) ...........................................................19, 23

*State of Minn. by Alexander v. Block,*
660 F.2d 1240 (8th Cir. 1981) ..............................................................25

*Stegemann v. United States,*
132 F.4th 206 (2d Cir. 2025) ................................................................22

vi

*Suquamish Tribe v. United States*,
　　5 Ind. Cl. Comm. 158 (1957) ........................................................39

*Toomer v. Witsell*,
　　334 U.S. 385 (1948) ....................................................................25

*Tulee v. Washington*,
　　315 U.S. 681 (1942) ...............................................................26, 27

*Unkechaug Indian Nation v. N.Y. State Dep't of Env't Conservation*,
　　667 F. Supp. 3d 137 (E.D.N.Y. 2023)..........................................18

*United States v. Abouselman*,
　　976 F.3d 1146 (10th Cir. 2020)........................................21, 56, 57

*United States v. Eberhardt*,
　　789 F.2d 1354 (9th Cir. 1986) .......................................................2

*United States v. Long Cove Seafood, Inc.*,
　　582 F.2d 159 (2d Cir. 1978) ....................................................24, 25

*United States v. Michigan*,
　　471 F. Supp. 192 (W.D. Mich. 1979), *aff'd in part and modified in part*,
　　653 F.2d 277 (6th Cir. 1981) .......................................2, 23, 45, 47

*United States v. Pueblo of San Ildefonso*,
　　513 F.2d 1383 (Ct. Cl. 1975).......................................................37

*United States v. Santa Fe Pac. R.R. Co.*,
　　314 U.S. 339 (1941) ...........................................................*passim*

*United States v. Seminole Indians of Fla.*,
　　180 Ct. Cl. 375 (Ct. Cl. 1967) .........................................30, 35, 45

*United States v. Shoshone Tribe of Indians*,
　　304 U.S. 111 (1938) .....................................................................8

*United States v. Winans*,
　　198 U.S. 371 (1905) ..................................................................7, 26

*Upper Chehalis Tribe v. United States*,
155 F. Supp. 226 (Ct. Cl. 1957) ....................................................35

*Upper Skagit v. United States*,
8 Ind. Cl. Comm. 492 (1960) ........................................................39

*Ward v. Race Horse*,
163 U.S. 504 (1896) ......................................................................27

*Washington v. Satiacum*,
314 P.2d 400 (Wash. 1957) ...........................................................27

*Wash. State Dep't of Licensing v. Cougar Den, Inc.*,
586 U.S. 347 (2019) ........................................................................4

*Western Mohegan Tribe & Nation v. Orange Cty.*,
395 F.3d 18 (2d Cir. 2004) ............................................................15

*Windward Bora, LLC v. Wilmington Sav. Fund Soc'y, FSB*,
982 F.3d 139 (2d Cir. 2020) ..........................................................21

*Worcester v. Georgia*,
31 U.S. (6 Pet.) 515 (1832) ..........................................1, 4, 8, 10, 52

**Statutes**

25 U.S.C. § 177 ........................................................................41, 43

28 U.S.C. § 1291 ............................................................................5

28 U.S.C. § 1331 ............................................................................5

42 U.S.C. § 1981 ..........................................................................13

42 U.S.C. § 1982 ..........................................................................13

43 U.S.C. § 1301 ..........................................................................45

Act of July 22, 1790, 1 Stat. 137 (1790) ......................................41

**Other Authorities**

Articles of Confederation of 1781, art. IX, ¶ 4 .................................................40

Bethany R. Berger, *Property and the Right to Enter*,
80 Wash. & Lee L. Rev. 71 (2023)................................................55

Beverly Jensen, Images of America: Shinnecock Indian Nation (2015)............10

Cohen's Handbook of Federal Indian Law
(Nell Jessup Newton ed., 2012) ........................................7, 29, 48

Dep't of Interior, Bureau of Indian Affairs, Summary Under the Criteria
and Evidence for the Proposed Finding for Acknowledgment of the
Shinnecock Indian Nation (Dec. 19, 2009) ....................................9

Indian Entities Recognized by and Eligible to Receive Services from the
United States Bureau of Indian Affairs, 91 Fed. Reg. 4,102 (Jan. 30, 2026)...9

James Truslow Adams, History of the Town of Southampton East of
Canoe Place (1918) .................................................................32, 38

Letter from Bryan Newland, Assistant Secretary – Indian Affairs,
Dep't of Interior to Lisa Goree, Chairwoman, Shinnecock Indian Nation
(Jan. 2, 2025) ............................................................................9, 43

M.R. Harrington, Anthropological Papers of the American Museum of Natural
History: An Ancient Village Site of the Shinnecock Indians (1924)..10, 33, 34

State Defs' Br., *Silva v. Farrish*,
47 F.4th 78 (2d Cir. Sept. 29, 2021) (No. 21-0616), ECF No. 47 .................15

The Duke of York's Laws (1665) ........................................................53

The First Book of Records of the Town of Southampton with Other Ancient
Documents of Historic Value (John H. Hunt, Book and Job Printer
1874)..........................................................................................32, 36

U.S. Dep't of Commerce, Econ. Dev. Admin., Federal and State Indian
Reservations: An EDA Handbook (1971) ....................................10

ix

William Wallace Tooker, *Some Indian Fishing Stations Upon Long Island* (1901) ..................................................................................................32

## INTRODUCTION

This case is about whether the aboriginal fishing rights of the Shinnecock Indian Nation ("Shinnecock" or "Nation") continue to remain intact in New York waters. The Nation is a federally recognized sovereign Indian nation that has occupied its ancestral territory on the east end of Long Island since time immemorial. Consistent with this Court's earlier opinion, Plaintiffs-Appellants David Silva, Gerrod Smith, and Jonathan Smith, members of the Nation (collectively, "Plaintiffs"), seek a declaration that their retained aboriginal fishing rights continue to exist and prospective injunctive relief against New York State officials from unreasonably interfering with those rights. Plaintiffs' remaining requested relief would not "prevent others from fishing," but rather "[i]t would merely resolve" their claim that they have a "right to fish." *Silva v. Farrish*, 47 F.4th 78, 85 (2d Cir. 2022).

A bedrock rule of federal Indian law is that Indian nations have "always been considered as distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial." *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832). Aboriginal rights "flow[] from a settled governmental policy" and do not depend on "any statute or other formal governmental action" for their existence. *Cramer v. United States*, 261 U.S. 219, 229 (1923). "The right to fish is one of the aboriginal usufructuary rights included within the totality of use and occupancy rights which Indian tribes might

possess." *United States v. Michigan*, 471 F. Supp. 192, 256 (W.D. Mich. 1979), *aff'd in part and modified in part*, 653 F.2d 277 (6th Cir. 1981). Aboriginal rights continue to exist until a discovering sovereign takes "plain and unambiguous action" intended to extinguish such rights and exercises "complete dominion adverse to the right of occupancy." *United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 346-47 (1941).

Aboriginal Shinnecock fishing rights continue to remain intact. The district court erroneously held that the conservation necessity doctrine and aboriginal fishing rights are incompatible and cannot coexist. "Unlike Congress, states may not qualify Indian fishing rights." *United States v. Eberhardt*, 789 F.2d 1354, 1361 (9th Cir. 1986). State police powers over wildlife have always been subject to an important limitation: they "exist only 'in so far as [their] exercise may be not incompatible with, or restrained by, the rights conveyed to the federal government by the Constitution.'" *Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976) (quoting *Missouri v. Holland*, 252 U.S. 416, 434 (1920)). "Aboriginal rights based on occupation and use are entitled to the protection of federal law even when they are not formally recognized as ownership by treaty or statute." *People of Village of Gambell v. Clark*, 746 F.2d 572, 574 (9th Cir. 1984). Conservation necessity does not enable New York State to unilaterally strip away and erase aboriginal fishing rights by merely possessing regulatory authority over natural resources.

Well-settled federal Indian law precedent establishes that tribal rights "can coexist with state management of natural resources," *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204 (1999), and the U.S. Supreme Court has repudiated prior case law that "rested on a false premise" that tribal rights to hunt, fish, and gather "conflict[] irreconcilably with state regulation of natural resources," *id.* The conservation necessity doctrine "accommodates both the State's interest in management of its natural resources" and tribal rights. *Id.* at 205.

The district court below also, without any examination or analysis, wrongly relied on then-District Judge Bianco's opinion in *New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185 (E.D.N.Y. 2007), *vacated*, 686 F.3d 133 (2d Cir. 2012)—vacated by this Court for lack of federal subject matter jurisdiction—to grant summary judgment in Defendants' favor. A judgment vacated for lack of subject matter jurisdiction is "void," *Hoffler v. Bezio*, 726 F.3d 144, 156 (2d Cir. 2013), and "has no effect," *Fort Knox Music Inc. v. Baptiste*, 257 F.3d 108, 110 (2d Cir. 2001). Despite being void and having no legal effect, *Shinnecock Indian Nation* has no bearing on whether aboriginal Shinnecock fishing rights continue to exist in New York waters. The district court also ignored the body of case law confirming that aboriginal rights can exist even after aboriginal title to land has been extinguished.

Aboriginal fishing rights do not depend on aboriginal title to lands or waters. The question of title among non-Indians does not affect the underlying rights of

Indians. "[R]ight of use and occupancy by Indians … is not the same as sovereign or legal title." *Sac & Fox Tribe of Indians of Okla. v. United States*, 383 F.2d 991, 997 (Ct. Cl. 1967), *cert. denied*, 389 U.S. 900 (1967). Since the beginning, a discovering sovereign acquired fee title to lands that "asserted a title against Europeans only, and [was] considered as blank paper, so far as the rights of the natives were concerned." *Worcester*, 31 U.S. at 546. Traditional use of land and resources by a tribe and its members "differ[s] significantly from the occupancy of settlers." *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1165 (10th Cir. 2015). A non-exclusive aboriginal fishing-rights claim is "not asserting a claim of sovereign rights" but rather a claim "assert[ing] merely a right to occupy and use, rather than title to," waters and submerged lands. *People of Village of Gambell v. Hodel*, 869 F.2d 1273, 1276-77 & n.3 (9th Cir. 1989).

Without any plain and unambiguous source of extinguishment, Defendants fall back on what they hope to be convincing equitable arguments. They contend that "impossibility" and longstanding "settled expectations" should lead to disregarding Shinnecock fishing rights. These equitable arguments, however, do not defeat non-possessory and non-exclusive aboriginal fishing rights. Like in other Indian law cases, "[i]t turns out … that the State's parade of horribles isn't really all that horrible." *Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347, 375 (2019) (Gorsuch, J., concurring).

It is critical to recognize the specific scope of Plaintiffs' requested relief. Plaintiffs seek to affirm the existence of aboriginal Shinnecock fishing rights alongside non-Indians, continuing their tradition of sharing their ancestral waters and use of marine resources with all who call Long Island home. Such relief would not take away rights from other individuals or entities, because Plaintiffs' fishing-rights claim "is not a 'right to *exclude all others*.'" *Silva*, 47 F.4th at 85 n.7 (citation omitted) (emphasis in original). "If the plaintiffs succeed in obtaining their requested relief, at most the state would need to tailor its regulatory scheme to respect the plaintiffs' fishing rights." *Id.* at 86.

Based on the reasons set forth herein, the Court should reverse the district court's granting of summary judgment in Defendants' favor.

## JURISDICTIONAL STATEMENT

The district court's jurisdiction arose under 28 U.S.C. § 1331 because the dispute involves a federal question. On October 6, 2025, the district court entered judgment granting Defendants' summary judgment motion and denying Plaintiffs' summary judgment motion. SPA-7. A notice of appeal was timely filed on October 31, 2025. JA-1304. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the district court erred by characterizing Plaintiffs' remaining fishing-rights claim for declaratory and injunctive as clarified by this Court in *Silva*

*v. Farrish*, 47 F.4th 78, 89-90 (2d Cir. 2022), as a legal challenge to New York's American eel regulations.

2.    Whether the district court erred in holding that the conservation necessity doctrine is incompatible and cannot coexist with aboriginal Shinnecock fishing rights.

3.    Whether the district court erred in relying on then-District Judge Bianco's opinion in *New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185 (E.D.N.Y. 2007), *vacated*, 686 F.3d 133 (2d Cir. 2012)—which was vacated by this Court for lack of federal subject matter jurisdiction and dealt with the inapposite issue of whether the Shinnecock hold aboriginal *title* to a parcel of land in Southampton, New York—as "highly persuasive" in deciding if aboriginal Shinnecock fishing rights continue to exist in New York waters.

4.    Whether the Shinnecock Indian Nation has established aboriginal fishing rights in New York waters that may be exercised by its tribal members.

5.    Whether aboriginal Shinnecock fishing rights, if established, have been extinguished by a specific affirmative action by a "discovering" sovereign that manifests a clear and unambiguous intent to accomplish such result.

## STATEMENT OF THE CASE

### A. Legal Background.

"[T]he Indians as tribes or nations, have been considered as distinct, independent communities, retaining their original, natural rights as the undisputed possessors of the soil, from time immemorial." *Holden v. Joy*, 84 U.S. 211, 244 (1872). "When Europeans arrived on the North American continent, hunting, fishing, and trapping, and gathering were vital to Indian life." Cohen's Handbook of Federal Indian Law § 18.01, at 1154 (Nell Jessup Newton ed., 2012). Such activities "were not much less necessary to the existence of the Indians than the atmosphere they breathed." *United States v. Winans*, 198 U.S. 371, 381 (1905).[1]

In *Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543 (1823), a foundational federal Indian law case, the U.S. Supreme Court explained that a discovering sovereign acquired fee title "against all other European governments," but that "the original inhabitants" remained "the rightful occupants of the soil, with a legal as well as a just claim to retain possession of it, and to use it according to their own discretion." *Id.* at 573-74. The "discovering" sovereign took fee title "subject only to the Indian right of occupancy." *Id.* at 568, 584-85. The Supreme Court reviewed the law of all the sovereigns that had claimed territory within North America—England, Holland,

---

[1] *Winans* establishes that treaties and agreements with Indian tribes are "not a grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted." 198 U.S. at 381.

France, and Spain—and explained that the law of "discovery" was "universal[ly] recogni[zed]." *Id.* at 573-74.

Under the law of discovery, the so-called discoverers "asserted the ultimate dominion to be in themselves" on lands, "subject … to the Indian right of occupancy." *Id.* at 574. The discoverer's fee title "asserted a title against European only, and [was] considered as blank paper, so far as the rights of the natives were concerned." *Worcester*, 31 U.S. at 546. The discovery gave the sovereign only an "ultimate reversion in fee," *Mitchel v. United States*, 34 U.S. (9 Pet.) 711, 756 (1835), subject to the Indians' "perpetual right of possession … considered as sacred as the fee-simple of the whites," *id.* at 745-46. The Supreme Court has emphasized that the Indian "occupancy of the land is not less valuable than full title in fee." *United States v. Shoshone Tribe of Indians*, 304 U.S. 111, 116 (1938).

Aboriginal rights based on the Indian right of use and occupancy are inherent and "flow[] from a settled governmental policy," and do not require any affirmative sovereign recognition through a "statute or other formal governmental action" to exist. *Cramer*, 261 U.S. at 229; *Native Village of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012) ("Aboriginal rights don't depend on a treaty or act of Congress for their existence."). Until a sovereign affirmatively extinguishes aboriginal rights, such "rights are superior to those of third parties, including the states." *People of Village of Gambell*, 746 F.2d at 574.

8

### B. Factual and Procedural Background.

#### 1. Shinnecock Background and Fishing History.

The Shinnecock Indian Nation is a federally recognized Indian nation located within the boundaries of New York. Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 91 Fed. Reg. 4,102, 4,105 (Jan. 30, 2026). The Nation is amongst a relatively small number of federally recognized Indian nations in the Eastern United States that were never wholly displaced from their aboriginal homelands.

The Shinnecock have never left their ancestral homelands on the east end of Long Island and they continue to occupy their homelands today. *See, e.g.*, Dep't of Interior, Bureau of Indian Affairs, Summary Under the Criteria and Evidence for the Proposed Finding for Acknowledgment of the Shinnecock Indian Nation (Dec. 19, 2009), JA-549 ("The evidence in the record indicates that there was a Shinnecock Indian tribe on the eastern end of Long Island in the early colonial period."); Letter from Bryan Newland, Assistant Secretary – Indian Affairs, Dep't of Interior to Lisa Goree, Chairwoman, Shinnecock Indian Nation (Jan. 2, 2025), JA-668 ("[T]he Nation has resided within its aboriginal territory since time immemorial and has never removed thereform[.]").

Fishing is and always has been the lifeblood of the Shinnecock. "[T]he Shinnecock have harvested fish and shellfish for centuries" in their traditional

fishing areas. Beverly Jensen, Images of America: Shinnecock Indian Nation 15 (2015). "[T]he outstanding fact of ancient Shinnecock economics: that the sea furnished the greater part of their living." M.R. Harrington, Anthropological Papers of the American Museum of Natural History: An Ancient Village Site of the Shinnecock Indians (1924), JA-387. "The Shinnecock … were largely a fishing and whaling tribe. They had contact with the Algonquin tribes in Connecticut, travelling the Long Island Sound." U.S. Dep't of Commerce, Econ. Dev. Admin., Federal and State Indian Reservations: An EDA Handbook (1971), JA-423.

### 2.   English Colonization of Eastern Long Island.

"Soon after Great Britain [became] determined on planting colonies in America, the king granted charters to companies of his subjects who associated for the purpose of carrying the views of the crown into effect, and of enriching themselves." *Worcester*, 31 U.S. at 544. Indian nations "existed as 'self-governing sovereign political communities'" that "d[id] not 'cease to be sovereign and independent'" after colonization. *Haaland v. Brackeen*, 599 U.S. 255, 308 (2023) (Gorsuch, J., concurring) (citations omitted).

"When the British crossed the Atlantic, they brought with them their own legal understandings." *Id.* "[T]he British regarded 'the Indians as owners of their land.'" *Id.* at 309 (citation omitted). "Britian often purchased land from Tribes (at least nominally) and predicated its system of legal title on those purchases." *Id.*

In 1640, the first English colonists arrived on eastern Long Island. JA-197. Shortly after their arrival, English colonists sought land deeds from the Indians as the Dutch "were also founding towns on Long Island" and the deeds provided "an added acknowledgment of their right to the land." JA-307.

On December 13, 1640, English colonists negotiated with the Shinnecock for the first time for the purchase of Indian lands. JA-446–JA-448. In the transaction— referred to as the 1640 Deed to Southampton—the Shinnecock who were identified as "the native Inhabitants & true owners of the eastern [part] of the Long Island" purportedly granted to English colonists the lands bounded on the west by "the place where the Indians hayle over their [canoes] out of the North bay to the south side of the Island." JA-446–JA-447.

From 1648 to 1662, English colonists acting *without* royal or sovereign authority, executed purported agreements with the Shinnecock and other Indian groups for the purchase of Indian lands, beach access, and more. JA-1046; JA-1047; JA-1049; JA-1051; JA-1053. These deeds reflect the Shinnecock's intent to preserve access to waters that they depended upon for their livelihood. JA-591.

On November 1, 1676, New York Colonial Governor Edmond Andros issued a patent (the "Andros Patent") to the proprietors of Southampton purportedly confirming the existence of the Town of Southampton and the Town's possession of a certain tract of land. JA-480–JA-481. On December 6, 1686, New York Colonial

11

Governor Thomas Dongan issued a similar patent (the "Dongan Patent") to the proprietors of Southampton confirming that a "certaine tract of Land" belonged to Southampton. JA-482–JA-488.

In 1703, in an attempt to put an end to land disputes, the Town of Southampton entered into a purported land cessation involving lands within the Shinnecock's territory, which included Shinnecock Hills. JA-495–JA-496. By its terms, the Shinnecock obtained a 1,000-year lease of land within its already reduced territory. JA-495. In return, the Town received a deed to the Nation's interest in the remainder of its aboriginal territory. JA-495. In 1859, the New York State Legislature enacted a law purporting to convey all of the Nation's "right, title and interest in and to certain lands" to the Southampton proprietors. JA-499. The United States did not authorize the New York State Legislature to pass the 1859 Act. JA-335.

### 3. This Present Lawsuit.

This litigation already has a long and storied procedural history dating back to 2018. On June 22, 2018, Plaintiffs brought this suit against New York State Department of Environmental Conservation ("NYSDEC") officials; the NYSDEC itself; Jamie Greenwold, an Assistant District Attorney at the Suffolk County District Attorney's Office; and the Suffolk County District Attorney's Office. JA-30–JA-31 (Compl. ¶¶ 2-10). Plaintiffs were previously cited and prosecuted in New York state courts for alleged violations of the New York Environmental Conservation Law

while engaging in fishing-related activities in Shinnecock Bay. JA-31–JA-33 (*Id.* ¶¶ 14, 16, 18-20).

In October 2008, Plaintiff Gerrod Smith was prosecuted for possessing out-of-season and undersized summer flounder, out-of-season and undersized porgy, and undersized blackfish harvested from Shinnecock Bay. JA-33 (*Id.* ¶ 18). Around the same time, Plaintiff Jonathan Smith received a civil infraction ticket and criminal summons for operating an unpermitted aquaculture facility in Shinnecock Bay and for using improper shellfish tags. JA-33 (*Id.* ¶ 19). The cases against Gerrod Smith and Jonathan Smith were ultimately dismissed. JA-33 (*Id.* ¶¶ 18-19).

In 2017, Plaintiff Silva was charged with fishing without a license and with the unlawful possession of undersized eels and possession of eels over the limit in violation of New York law. JA-33 (*Id.* ¶ 20). While Plaintiff Silva's criminal prosecution was pending in state court, Plaintiffs filed this present lawsuit in the U.S. District Court for the Eastern District of New York. *Silva*, 47 F.4th at 82.

Plaintiffs asserted two separate claims for injunctive relief: (1) an injunction to enjoin Plaintiff Silva's state court criminal prosecution; and (2) an injunction to enjoin Defendants from interfering with their fishing rights and use of waters. JA-35 (Compl. ¶ 1 (Prayer for Relief)). Plaintiffs also sought a claim under 42 U.S.C. §§ 1981 and 1982 of the Civil Rights Act for monetary damages for alleged

13

discrimination by "Defendants for blocking Plaintiffs' participation in the elver eel market." JA-34–JA-35 (*Id.* ¶¶ 24-25, ¶ 2 (Prayer for Relief)).

### 4. Initial Rulings.

Plaintiffs initially moved for a preliminary injunction. JA-37. The district court denied Plaintiffs' preliminary injunction motion on the grounds that, at that time, it believed Plaintiff Silva failed to show a likelihood of success on the merits and that even if he had, abstention was required under the *Younger* abstention doctrine. JA-39–JA-49. The court held that Plaintiffs Gerrod Smith and Jonathan Smith lacked standing. JA-48–JA-49.

Defendants moved to dismiss Plaintiffs' Complaint. *Silva*, 47 F.4th at 83. Magistrate Judge Locke recommended dismissal, and Plaintiffs objected to the Magistrate's recommendation. *Id.* Defendants filed summary judgment motions. *Id.*

On May 27, 2020, Magistrate Judge Locke concluded that the *Younger* abstention doctrine precluded Plaintiff Silva's claim for prospective relief, and that Plaintiffs Gerrod Smith and Jonathan Smith lacked standing. *Id.* The Magistrate recommended that Plaintiffs' discrimination claim under the Civil Rights Act failed to state a claim. *Id.* at 83-84. The district court adopted the Magistrate's report and recommendation "in its entirety." *Id.* at 84. Plaintiffs appealed. *Id.*

**5. This Court's Reversal.**

On August 25, 2022, this Court reversed the district court's dismissal of Plaintiffs' claim for declaratory and injunctive relief against NYSDEC officials (the only remaining Defendants). *Silva*, 47 F.4th at 78. This Court held that "*Ex parte Young* applies to the plaintiffs' fishing-rights claims … because the plaintiffs alleged an ongoing violation of federal law and seek prospective relief against state officials." *Id.* at 82.

On appeal, Defendants relied on *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997), and *Western Mohegan Tribe & Nation v. Orange County*, 395 F.3d 18 (2d Cir. 2004), to contend that *Ex parte Young* "does not apply when, as here, plaintiffs seek to divest the state of regulatory jurisdiction over public land and navigable waters, and effectively impinge on the State's sovereign exercise of fee title in such lands and waters." State Defs' Br. at 2, *Silva v. Farrish*, 47 F.4th 78 (2d Cir. Sept. 29, 2021) (No. 21-0616), ECF No. 47.

This Court determined that *Coeur d'Alene* and *Western Mohegan* are inapposite, as Plaintiffs' requested relief "would not transfer ownership and control of the Shinnecock Bay from the state to an Indian tribe." *Silva*, 47 F.4th at 85. Rather, Plaintiffs' requested relief would "merely resolve" their claim that they have a "right to fish." *Id.* at 85-86. This Court held that *all* Plaintiffs have standing to pursue their claim for injunctive relief to enjoin Defendants "from interfering with [their] use of

15

the waters, fishing, taking fish, and holding fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters." *Id.* at 87, 89.

The Court dismissed as moot Plaintiff Silva's claim seeking to enjoin Defendants from enforcing New York state laws in Southampton Town Justice Court for allegedly "fishing without a license as well as … possess[ing] of underage eels and … eels over the limit." *Id.* This Court also dismissed Plaintiffs' Civil Rights Act claim seeking monetary damages for allegedly being blocked out of the eel market. *Id.* at 90. This Court remanded the case "for further proceedings consistent with th[e] opinion." *Id.*

### 6. Remand Proceedings.

On remand, the parties engaged in fact and expert discovery. Plaintiffs designated Dr. John Strong to serve as an expert historian. JA-577. Defendants designated Amalia Baldwin to serve as a historical witness and John Maniscalco, Jr. to serve as a fishery conservation expert focused on the American eel species. JA-180.

Plaintiffs contended that retained aboriginal Shinnecock fishing rights continue to exist in New York waters and those rights have not been extinguished by a sovereign manifesting a plain and unambiguous intent. Pls.' Mem. in Supp. of Summ. J. at 2, Dist. Ct. Docket # 161-11. Plaintiffs "acknowledge[d] that their

fishing rights would be subject to sound conservation management principles under the conservation necessity doctrine." *Id.* at 35.

Defendants argued that aboriginal Shinnecock fishing rights do not exist because "the Shinnecock Tribe does not possess aboriginal title to the territory in which Plaintiffs claim these rights." Defs.' Mem. in Supp. of Summ. J. at 1, Dist. Ct. Docket # 162-1. Even if aboriginal fishing rights continue to exist, Defendants claimed that the conservation necessity doctrine permits New York to regulate those rights. *Id.* Defendants characterized Plaintiffs' remaining claim as a legal challenge to New York's regulations "prohibiting taking or possessing glass eels." *Id.* at 29.

Four amicus briefs were submitted in Plaintiffs' support. The amicus briefs informed the district court on various aspects of the case, including: the inherent nature of aboriginal rights, Amicus Br. of United South and Eastern Tribes Sovereignty Protection Fund at 2-9, Dist. Ct. Docket #154; the "plain and unambiguous" standard necessary to extinguish aboriginal rights, Amicus Br. of National Congress of American Indians and Shinnecock Kelp Farmers at 8-9, Dist. Ct. Docket # 152; how aboriginal fishing rights do not depend on aboriginal title to land, *id.* at 9-14; how the conservation necessity doctrine works in the real world by balancing the rights and interests of states and tribes and by providing incentives for states and tribes to work together to co-manage natural resources, Amicus Br. of Great Lakes Indian Fish and Wildlife Commission at 8-12, Dist. Ct. Docket # 159;

and how 17th-Century Indian deeds and land patents did not extinguish aboriginal Shinnecock fishing rights in Shinnecock Bay, Great Peconic Bay, and the Atlantic Ocean, Amicus Br. of Law and History Professors at 4-11, Dist. Ct. Docket # 160.

On cross-motions for summary judgment, the district court sided with Defendants. The court framed the "main question [as] whether, regardless of any aboriginal title, the state fishing regulations at issue are reasonable and non-discriminatory." SPA-4. The court viewed Plaintiffs' remaining claim as a challenge to New York's "American eel regulations." SPA-4. Relying on Judge Kuntz's decision in *Unkechaug Indian Nation v. New York State Department of Environmental Conservation*, 667 F. Supp. 3d 137 (E.D.N.Y. 2023), the district court determined that "the conservation necessity doctrine requires that the Court grant summary judgment for defendants." SPA-4–SPA-5.

Plaintiffs filed a motion for reconsideration, asserting that their remaining claim does not concern a challenge to New York's eel regulations, and emphasizing how aboriginal fishing rights and New York's regulatory authority are fully compatible under the conservation necessity doctrine. Pls.' Mem. in Supp. of Recons. at 5-11, Dist. Ct. Docket # 168-1.

The district court denied reconsideration. The district court stated that "[g]iven that Plaintiff Silva was convicted in state court for eel fishing without a commercial license, … the state's regulations designed to protect American eels

were directly at issue." JA-1307. The district court said that it "has nothing to add beyond its reasoning" in its October 3, 2025 order and "[a]bsent binding precedent, the Court found the respective opinions of Judges Kuntz and Bianco to be highly persuasive." JA-1307.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Well-settled federal Indian law precedent confirms the continued existence of aboriginal Shinnecock fishing rights, and the district court's judgment entered in Defendants' favor should be reversed.

*First*, the district court incorrectly framed Plaintiffs' remaining claim as a legal challenge to New York's "American eel regulations." SPA-4. "[W]here the mandate limits the issues open for consideration on remand, the district court ordinarily may not deviate from the specific dictates or spirit of the mandate by considering additional issues on remand." *Sompo Japan Ins. Co. of Am. v. Norfolk S. R.R. Co.*, 762 F.3d 165, 175 (2d Cir. 2014). This Court already clarified that Plaintiffs' only remaining claim is injunctive relief to "enjoin[] the Defendants from … interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish." *Silva*, 47 F.4th at 89. The district court's characterization of Plaintiffs' remaining claim as a legal challenge to New York's eel regulations violates this Court's mandate regarding the scope of relief available on remand.

*Second*, the district court's holding that conservation necessity and aboriginal fishing rights are incompatible and cannot coexist is foreclosed by well-settled precedent. A "State's control over wildlife is not exclusive and absolute in the face of federal regulation and certain federally protected interests." *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 386 (1978). The Supreme Court has "repudiated" case law that "rested on a false premise" that tribal rights are "irreconcilable" with "state sovereignty over natural resources." *Herrera v. Wyoming*, 587 U.S. 329, 339 (2019). Plaintiffs' remaining claim is fully consistent and compatible with New York's regulatory authority over natural resources.

*Third*, aboriginal Shinnecock fishing rights continue to remain intact in New York waters. Aboriginal rights depend on "actual, exclusive, and continuous use and occupancy 'for a long time.'" *Sac & Fox Tribe*, 383 F.2d at 997. The Shinnecock have routinely fished in Long Island waters for their sustenance, economic livelihood, and cultural practices since time immemorial. This is sufficient to establish aboriginal Shinnecock fishing rights.

*Fourth*, aboriginal fishing rights do not depend on the existence of aboriginal title to land. This Court already clarified that this case does not concern title to land. *Silva*, 47 F.4th at 86. In any event, the "relinquishment of any tribal claims to land" is "distinguished from individual rights of occupancy," which "are not foreclosed or affected by the judgment in [a] case" regarding the relinquishment of claims to tribal

20

lands. *Santa Fe Pac.*, 314 U.S. at 357-58 & n.23; *People of Village of Gambell*, 869 F.2d at 1276-77 & n.3.

*Fifth*, no "discovering" sovereign has ever extinguished Shinnecock fishing rights. "[N]ot until the sovereign exercises [its] authority through clear and adverse affirmative action may it extinguish aboriginal rights." *United States v. Abouselman*, 976 F.3d 1146, 1160 (10th Cir. 2020). The district court, without any examination or analysis, implied without deciding that colonial-era deeds and land patents extinguished aboriginal Shinnecock fishing rights. SPA-5–SPA-6. But none of the deeds and land patents mention Shinnecock fishing rights—let alone purport to extinguish Shinnecock fishing rights in a "plain and unambiguous" manner.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant or denial of summary judgment *de novo*." *Windward Bora, LLC v. Wilmington Sav. Fund Soc'y, FSB*, 982 F.3d 139, 141 (2d Cir. 2020). This Court reviews *de novo* whether the district court complied with the scope of a mandate on remand. *Callahan v. Cty. of Suffolk*, 96 F.4th 362, 367 (2d Cir. 2024).

## ARGUMENT

**I.     The District Court Erred in Characterizing Plaintiffs' Remaining Claim as a Challenge to New York's American Eel Regulations.**

The district court below wrongly characterized Plaintiffs' remaining claim for declaratory and injunctive relief as a challenge to New York's "American eel

regulations." SPA-4; JA-1307 ("Given that Plaintiff Silva was convicted in state court for eel fishing without a commercial license, … the state's regulations designed to protect American eels were directly at issue."). In doing so, the district court exceeded this Court's mandate on the scope of Plaintiffs' remaining requested relief available on remand.

"A district court must follow the mandate issued by an appellate court." *Puricelli v. Republic of Argentina*, 797 F.3d 213, 218 (2d Cir. 2015). A district court is "bound to follow [a] decision by the mandate rule, an aspect of the law-of-the-case doctrine 'that 'rigidly binds the district court,' barring it from considering issues 'explicitly or implicitly decided on appeal.'" *Stegemann v. United States*, 132 F.4th 206, 210 (2d Cir. 2025) (citation omitted). "Where a mandate limits the issues open for consideration on remand, a district court ordinarily cannot consider additional issues." *Puricelli*, 797 F.3d at 218.

This Court already clarified the scope of declaratory and injunctive relief available to Plaintiffs on remand. In their Complaint, Plaintiffs "pursued two different claims for injunctive relief." *Silva*, 47 F.4th at 89. The first claim would "enjoin[] the Defendants from enforcing the laws of the State of New York against Plaintiff Silva in Southampton Town Justice Court in Case No. 17-7008" relating to eel fishing activities. *Id.* The second claim would "enjoin[] the Defendants from … interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish

22

and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters." *Id.*

When Plaintiffs filed this federal case, Plaintiff Silva's state court prosecution was still "ongoing," but there is "no dispute that Silva's prosecution has ended." *Id.* This Court stated that the claim to enjoin Plaintiff Silva's prosecution involving eel-fishing is "moot." *Id.* However, this Court held that Plaintiffs may proceed on the "second claim for injunctive relief." *Id.* Plaintiffs' remaining requested relief would resolve their claim that they have a "right to fish" and such "prospective relief against the DEC officials fall[s] within the *Ex parte Young* exception to state sovereign immunity." *Id.* at 85-86. Nowhere did this Court say that Plaintiffs' remaining claim is a challenge to New York's eel regulations, or that the focus of the remand proceedings would be limited to the eel species. *See id.* at 78-90.

On remand, the district court violated this Court's mandate by characterizing Plaintiffs' remaining claim as a challenge to New York's "American eel regulations." SPA-4. Plaintiffs' only claim open for consideration on remand was their "fishing-rights" claim. *Id.* at 82. This claim is not limited to any particular fish species. *Id.* at 90; *see also Michigan*, 471 F. Supp. at 260 (the right to fish "is not limited as to species of fish, origin of fish, the purpose of use or the time or manner of taking"). The district court had no authority to deviate from this Court's clear scope of relief available on remand. *See Sompo Japan Ins.*, 762 F.3d at 175.

## II. Aboriginal Shinnecock Fishing Rights Are Fully Compatible and May Coexist with New York's Management of Natural Resources.

The district court below determined that the conservation necessity doctrine compels summary judgment in Defendants' favor. SPA-5. But New York's regulatory interests over natural resources provide no basis to imply that aboriginal Shinnecock fishing rights have been extinguished. State police powers over natural resources have limitations and the conservation necessity doctrine presumes that tribal fishing rights do in fact exist in the first place.[2]

"[A] State's power to preserve and regulate wildlife within its borders is not absolute." *Hughes v. Oklahoma*, 441 U.S. 322, 342 (1979). The Supreme Court has long "recognized that the States' interest in regulating and controlling those things they claim to 'own,' including wildlife, is by no means absolute." *Baldwin*, 436 U.S. at 385. "As a general rule, wild fish … are owned by no one. Property rights in them are obtained by reducing them to possession." *United States v. Long Cove Seafood, Inc.*, 582 F.2d 159, 163 (2d Cir. 1978). This Court has explained that the "characterization[] of state ownership of wildlife" is "no more than a 19th century legal fiction expressing the importance to its people that a State have power to

---

[2] Cases involving the existence of tribal rights are typically bifurcated in two phases where the court first addresses the threshold question of whether the tribal rights exist, and second, the validity of state conservation and management measures relating to the implementation of such rights. *See, e.g.*, *Mille Lacs*, 526 U.S. at 185; *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 343 n.1 (7th Cir. 1983).

preserve and regulate the exploitation of an important resource." *Id.* at 165 (citation omitted).

State police powers over wildlife "exist only 'in so far as [their] exercise may be not incompatible with, or restrained by, the rights conveyed to the federal government by the Constitution.'" *Kleppe*, 426 U.S. at 545. "No doubt it is true that as between a State and its inhabitants the State may regulate the killing and sale of (wildlife), but it does not follow that its authority is exclusive of paramount powers." *Id.* (quoting *Holland*, 252 U.S. at 434).

"Under modern analysis, the question is simply whether the State has exercised its police power in conformity with the federal laws and Constitution." *Hughes*, 441 U.S. at 335; *State of Minn. by Alexander v. Block*, 660 F.2d 1240, 1252 (8th Cir. 1981) (explaining that "as an aspect of sovereignty, the state has the power to control the use of … waters for the benefit of the public" but this "authority, like any other state police power … must yield to any valid exercise of federal power").

State regulatory authority over wildlife is limited by the U.S. Constitution, such as the Commerce Clause. *See Toomer v. Witsell*, 334 U.S. 385, 396-99 (1948); *Baldwin*, 436 U.S. at 385-86. The Supremacy Clause also limits state power to regulate wildlife when the federal government legitimately exercises one of its enumerated powers to enter into treaties or make laws and regulations concerning wildlife. *See Kleppe*, 426 U.S. at 543 (Wild Free-Roaming Horses and Burros Act);

*Hunt v. United States*, 278 U.S. 96, 100 (1928) (federal regulation authorizing thinning of deer population in violation of state law).

This principle is fully applicable to limitations on state authority to regulate wildlife arising from tribal rights. In *United States v. Winans*, 198 U.S. 371 (1905), the Supreme Court held that an Indian treaty securing the "right of taking fish at all usual and accustomed places" and "of erecting temporary buildings for curing them" gave the Indians "a right in the land,—the right of crossing it to the river,—the right to occupy it to the extent and for the purpose mentioned." *Id.* at 381.

The Court explained that the "right was intended to be continuing against the United States and its grantees as well as against the state and its grantees." *Id.* at 381-82. The Court rejected the contention "that the rights conferred upon the Indians are subordinate to the powers acquired by the state upon its admission to the Union." *Id.* at 382. Notwithstanding the State's interests, "the power of the United States," while it held the country as a territory, to create rights which would be binding on the states had been settled in *Shively v. Bowlby*, 152 U.S. 1 (1894). *Id.* at 383. *Winans* left open the permissible scope of state regulation of Indian fishing rights, noting only that the right does not "restrain the state unreasonably, if at all, in the regulation of the right." *Id.*

In *Tulee v. Washington*, 315 U.S. 681 (1942), the Supreme Court returned to the question of conservation necessity. "Relying on its broad powers to conserve fish

26

and game within its borders," Washington State claimed the right to impose nondiscriminatory license fees on Indian fishermen, while Tulee, a member of the Yakama Tribe, asserted the State had no authority to regulate his fishing rights at all. *Id.* at 683-84. The Court found that the "state's construction of the treaty [was] too narrow" and Tulee's construction "too broad"; instead, it held that, "while the treaty leaves the state with power to impose on Indians equally with others such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here." *Id.* at 684.

In *Mille Lacs*, the Supreme Court rejected prior precedent, namely *Ward v. Race Horse*, 163 U.S. 504 (1896),[3] that "rested on a false premise" that tribal rights to hunt, fish, and gather "conflict[] irreconcilably with state regulation of natural resources." 526 U.S. at 204. The Court in *Mille Lacs* clarified that tribal rights "can

---

[3] Old cases applying an implicit extinguishment of tribal rights are no longer valid. In *Race Horse*, the Supreme Court held that the hunting rights of the Bannock Tribe did not survive Wyoming's admission to the Union. 163 U.S. at 515. In the Court's view, the Bannock's hunting right stood in "irreconcilable" conflict with Wyoming's authority to regulate game. *Id.* at 514. Relying on *Race Horse* and *Kennedy v. Becker*, 241 U.S. 556 (1916), "State laws which limited the rights of Indians under the various treaties were upheld as valid exercises of police power." *People v. Jondreau*, 185 N.W.2d 375, 378 (Mich. 1971). *Race Horse* and *Kennedy* have "been limited … by United States Supreme Court decisions" such as *Tulee. Id.* "These [more recent] cases … demonstrate a decisive trend in the decisions of Federal courts toward granting Indians expanded rights." *Id.* at 378-79; *Washington v. Satiacum*, 314 P.2d 400, 408-09 (Wash. 1957) ("Race Horse and Kennedy-Becker cases had been rejected by the supreme court of the United States in subsequent decisions.").

coexist with state management of natural resources." *Id.* The conservation necessity doctrine, the Court explained, "accommodates both the State's interest in management of its natural resources" and tribal rights. *Id.* at 205.

In *Herrera v. Wyoming*, 587 U.S. 329 (2019), the Supreme Court affirmed that *Race Horse* "must be regarded as retaining no vitality" after *Mille Lacs*, and made clear that tribal rights cannot be impliedly extinguished at statehood. *Id.* at 342. In *Herrera*, the Court rejected "the flawed belief that statehood could not coexist with a continuing [tribal] right," *id.* at 348, and explained that "the Court's precedent requires" "clear evidence" to abrogate or extinguish tribal rights, *id.* at 345.

Under modern precedent, although New York may be able to regulate fishing in waters within its regulatory jurisdiction, Plaintiffs may still exercise their aboriginal fishing rights. As this Court explained: "If the plaintiffs succeed in obtaining their requested relief, at most the state would need to tailor its regulatory scheme to respect the plaintiffs' fishing rights." *Silva*, 47 F.4th at 86.[4] The actual implementation, management, and regulation of aboriginal Shinnecock fishing rights can be resolved in a future proceeding, or potentially resolved by the parties,

---

[4] *See also Metlakatla Indian Cmty. v. Dunleavy*, 58 F.4th 1034, 1047 (9th Cir. 2023) (affirming the existence of fishing rights of the Metlakatla Indian Community, and explaining that "Alaska's limited entry [fishing] program, as currently administered, is incompatible with the Metlakatlans' off-reservation fishing rights," and "[a]ny regulation by Alaska of off-reservation fishing by the Community must be consistent with such rights").

28

once the existence of aboriginal Shinnecock fishing rights is affirmed. *See* Cohen's Handbook § 18.08, at 1201 ("Agreements and tribal-state comanagement of shared resources can address not only the myriad of practical issues such as bag limits, seasons, and enforcement, but also lingering mutual distrust and misunderstanding, born of the often acrimonious disputes that hunting and fishing controversies have engendered. The courts have recognized the benefits, and often encouraged the use, of tribal-state cooperation.").

## III. The Shinnecock Indian Nation Continues to Hold Aboriginal Fishing Rights in New York Waters That May Be Exercised By Its Members.

### A. Aboriginal Shinnecock Fishing Rights Exist in New York Waters.

The district court did not attempt to apply the longstanding legal test for establishing aboriginal rights. Aboriginal rights are established with "actual, exclusive, and continuous use and occupancy 'for a long time.'" *Sac & Fox Tribe*, 383 F.2d at 998; *Native Village of Eyak*, 688 F.3d at 622 (same). The legal meaning of each of these elements, *i.e.*, that the area is used and occupied, that it is used exclusively, and that it is used for a "long time," has been established, most notably through decades of application by the U.S. Claims Court and the Indian Claims Commission, the tribunals that handled aboriginal rights cases. The undisputed facts in this case clearly show the existence of aboriginal Shinnecock fishing rights in New York waters.

### 1. The Shinnecock's Long-Term Use and Occupancy of Long Island Waters Establishes Aboriginal Fishing Rights.

Under the first element, a court looks to a tribe's customs and ways of life to determine whether an area in question was "used" by the people. "Use and occupancy" means "use and occupancy in accordance with the way of life, habits, customs and usages of the Indians who are its users and occupiers." *Sac & Fox Tribe*, 383 F.2d at 998; *Mitchel*, 34 U.S. at 746 ("[T]heir hunting grounds were as much in their actual possession as the cleared fields of the whites."); *Pueblo of Jemez*, 790 F.3d at 1156.

"Use and occupancy" is not limited to the villages where a tribe's ancestors actually resided: "[T]he 'use and occupancy' … essential to the recognition of Indian title does not demand *actual* possession of the land, but may derive through intermittent contacts … which define some general boundaries of the occupied land." *United States v. Seminole Indians of Fla.*, 180 Ct. Cl. 375, 385 (Ct. Cl. 1967) (emphasis in original). In *Seminole*, the Court of Claims explained that "[h]ad the Seminoles chosen to live by food-raising alone, we would regard the 'village' evidence … [as] persuasive … in limiting the Seminoles' 'title' to the land falling within … their permanent homesites, … [b]ut the Seminoles … survived … by food-gathering and hunting as well …. Seminole land-use clearly encompassed more than the soil actually 'possessed.'" *Id.* at 384. Given this standard, the court concluded that the Seminole "used" the entire Florida peninsula. *Id.* at 386.

30

In accordance with this standard, Shinnecock use and occupancy is viewed through the lens of the Shinnecock culture. The Shinnecock are a maritime culture who have historically depended on fish and marine resources for their sustenance, culture, and traditional and religious practices since time immemorial. JA-581. The first evidence of Shinnecock fishing in Long Island waters is found in the late Archaic Period dating back to at least 1,000 B.C. JA-276.

The first mention of the Shinnecock in colonial-era records appears to be made by Issack de Rasieres in around 1628 identifying the Shinnecock's wampum making: "where many [Indians] dwell, who support themselves by planning maize and making sewan, and who are called … Sinnecox." JA-368. By the time the first English settlers arrived in present-day Southampton, the Shinnecock had long fished and used the waters in and around Long Island for cultural purposes, sustenance, and trade. JA-581.

The history of the Town of Southampton in its own records states that: "When the first settlers arrived they found the island inhabited by a race whose origin is wrapped in utter obscurity. From the little that is found in these records concerning them, it appears that the whole extent of what is now the town of Southampton was owned by the Shinnecock tribe of Indians, who were divided into many small bands, and were living in villages that were without exception situated near the different creeks or branches of the bays, forming so important a part of the geography of the

town." The First Book of Records of the Town of Southampton with Other Ancient Documents of Historic Value at II-III (John H. Hunt, Book and Job Printer 1874).

Defendants' historical expert agrees that the Shinnecock historically "lived in small villages scattered on the south fork of eastern Long Island" and the "villages were concentrated along streams, bays, and tidal estuaries, and people moved from place to place to take advantage of seasonal or local abundance of resources." JA-193. The close proximity to ocean waters to access fish and marine resources has made Long Island an ideal home for the Shinnecock. JA-278.

Fishing was necessary for the Shinnecock's survival on Long Island. JA-278–JA-279; History of the Town of Southampton East of Canoe Place at 27 (stating that for the Shinnecock, "fish … formed a large part of their diet"). Fish and marine resources provided the Shinnecock with a consistent and adequate food supply in comparison to hunting on land. JA-279; *see also* William Wallace Tooker, Some Indian Fishing Stations Upon Long Island (1901), JA-403 ("[T]he waters afforded a more abundant and more certain food supply for the natives than could be obtained by their precious methods of hunting, or by their crude processes of agriculture.").

Experts on both sides agree that archaeological evidence shows the Shinnecock occupied lands on the east end of Long Island long before the arrival of the first English colonists, and the Shinnecock fished and used the marine resources in Long Island waters as far back as history goes. *See* JA-581–JA-583 (Plaintiffs'

32

expert discussing archaeological evidence of early Shinnecock presence on Long Island and fishing activities since time immemorial); JA-279–JA-281 (same); JA-190 (Defendants' expert acknowledging the "historical and cultural importance of marine resources to the Shinnecock Nation"); JA-298–JA-299 (Defendants' expert acknowledging the "Shinnecock have been [on Long Island] for thousands of years" and "made use of the full environment available there" and that "archeological evidence points to [the Shinnecock] having used the marine resources as well as the land resources for as far back as we can go"); JA-193 (Defendants' expert stating that "archaeological and ethnohistorical evidence indicates that [the Shinnecock] lived on Long Island subsisting on the natural resources … available on the island").

In 1902, Mark Harrington for the American Museum of Natural History in New York conducted "the first attempt to study in detail any of the aboriginal village sites on the eastern end of Long Island," which belonged to the Shinnecock. JA-383. Mr. Harrington endeavored to uncover "the material side of the life of the Indians who inhabited this village, and to give a glimpse of their arts and crafts, their dwellings, and the means by which they gained their livelihood." JA-383.

As a means of sustenance, Mr. Harrington observed that "the Shinnecock made good use of all the edible creatures the local waters afforded." JA-388. Mr. Harrington explained that the close proximity to the Atlantic Ocean made the "region attractive to the Indian[s], supplementing its natural advantages of good springs of

water, proximity to the ocean and to nearly land-locked bays furnishing the best of fishing and numerous clams and oysters, a nearby forest which must have abounded in game and convenient fertile tracts suitable for cultivation." JA-385.

The federal government has affirmatively supported the Shinnecock activities and use and occupancy of Long Island waters. In the 1970s, the Shinnecock received financial support from the federal government to support its oyster farm in Shinnecock Bay as well as send four Shinnecock tribal members to attend the Lummi Indian School of Aquaculture in Washington State to study the operation of one of the largest oyster-fish producing hatcheries in the United States. JA-361.

When the Shinnecock tribal members returned, the Shinnecock's governing body turned to the American Indian Development Association for assistance to organize the Shinnecock's own tribal facility—the Shinnecock Tribal Oyster Project—"to research the possibility of replenishing Shinnecock Bay." JA-361. Between 1977 and 1978, the Shinnecock constructed a hatchery and launched oyster trays into the waters in Heady Creek near the Shinnecock's lands. JA-361. It was the first such facility in Southampton. JA-361.

Because the historical record clearly demonstrates that the Shinnecock have used and occupied the waters around Long Island for fishing since time immemorial, Plaintiffs have, as a legal matter, satisfied the long-term use and occupancy requirement for establishing aboriginal fishing rights. *See Alabama-Coushatta Tribe*

*of Texas v. United States*, No. 3-83, 2000 WL 1013532, at *39-42 (Fed. Cl. June 19, 2000) (holding that "period of 30 years" satisfies "the 'long time' requirement" for establishing aboriginal rights); *Seminole Indians*, 180 Ct. Cl. at 387 (holding that use for "more than 50 years" is sufficient to establish long-term use).

## 2. The Shinnecock Exclusively Used Long Island Waters.

The "exclusivity" prong of the aboriginal rights test is also satisfied for the establishment of aboriginal Shinnecock fishing rights. "Exclusively is established when a tribe or a group shows that it used and occupied the land to the exclusion of other Indian groups" historically. *Native Village of Eyak*, 688 F.3d at 624. The area of the aboriginal rights need only be defined by general boundaries. *Upper Chehalis Tribe v. United States*, 155 F. Supp. 226, 229 (Ct. Cl. 1957) (explaining that tribal claimants do not have to define the claimed area with surveyor-like precision, but rather "some general boundary lines of the occupied territory must be shown").

Because "it is extremely difficult to establish facts after the lapse of time involved in matters of Indian litigation," it is "necessary to take a common sense approach" "to establish boundaries and occupancy." *Id.* "[T]he ultimate fact of beneficial ownership by exclusive possession and occupancy can only be inferred and found from many separate events and a variety of documentary material … with reference to or having a bearing on the tribe or the area in question." *Snake or Piute Indians v. United States*, 112 F. Supp. 543, 552 (Ct. Cl. 1953).

Defendants do not object to the fact that the Shinnecock have "exclusively" used and occupied the waters around the Town of Southampton. Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. at 3, Dist. Ct. Docket No. 161-14. Rather, Defendants dispute only that the Shinnecock historically used and occupied the Atlantic Ocean waters outside of Southampton's boundaries to the exclusion of other Indian groups. *Id.* The common use of fishing by the Shinnecock and other Algonquin tribal villages within New York's now-existing 3-mile jurisdictional boundary is legally sufficient to establish "exclusive" use in not only the Town of Southampton's boundaries, but also New York's jurisdictional boundary.

There is no dispute that the Shinnecock have historically occupied and used the waters around the Town of Southampton to the exclusion of other Indian groups. As Defendants' historical expert explained, "[t]he peoples who came to be identified as Shinnecock generally lived between the peoples who came to be known as the Montauketts (on the eastern end of the southern fork of Long Island) and the Unkechaugs (who spanned the island west of the forks)." JA-193; Southampton Book of Records at II (explaining that, when the English colonists arrived, the "whole extent of what is now the town of Southampton was owned by the Shinnecock tribe of Indians"); 1640 Deed to Southampton, JA-446 (recognizing the Shinnecock as "the native Inhabitants & true owners of the eastern [part] of the Long Island").

36

The Shinnecock also have, within the meaning of the legal test, exclusively used and occupied the waters of Long Island within New York's now-existing 3-mile jurisdictional boundary, despite some common use of such waters with other Algonquian tribal villages. The Court of Claims has acknowledged "on several occasions, that two … or more tribes … might inhabit a region in joint and amicable possession without destroying the 'exclusive' nature of their use and occupancy, and without defeating Indian title." *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1394 (Ct. Cl. 1975). It explained that "[t]here are no holdings of this court which say that two Indian tribes or groups, each a separate 'entity' and each with its own separate lands, can never assert joint ownership to other lands which are commonly used and occupied." *Id.* at 1395.

Historically, the Shinnecock and other native villages on Long Island had close cultural and political ties to one another and consistently used Long Island waters as a common resource. As explained by Defendants' historical expert, the Shinnecock "spoke an Eastern Algonquian language and were culturally and linguistically affiliated with other villages located" in the region. JA-193. Ms. Baldwin further stated that "[t]he eastern Long Island Indigenous villagers had close family and political ties to other villages in the region with whom they traded, intermarried, and united for protection." *Id.* The tribal villages on Long Island historically "belonged to the great Algonquin family, the most widely extended of

all the aboriginal stocks, and differed so little among themselves as almost to be considered bands rather than tribes." History of the Town of Southampton East of Canoe Place at 22.

Indeed, there was even political overlap between the Long Island Algonquin tribal communities. For example, while a leader of the Montaukett, Sachem Wyandanch also represented the Shinnecock. JA-268. As Ms. Baldwin stated, Wyandanch "repeatedly worked with local sachem Mandush" on matters and "earn[ed] him greater credentials in the negotiations and land sales that followed." JA-198. Ms. Baldwin explained that scholars "generally agree that Wyandanch was an important cultural intermediary who no subsequent leader was able to replace." JA-199. The four sachems of the Shinnecock, Montaukett, Corchaug, and Manhansett negotiated the 1648 Deed to East Hampton involving the sale of a tract of land to an English consortium. JA-947–JA-950. These four sachems all had "related family structures." JA-264–JA-265.

The common use of fishing waters in and around Long Island by the Shinnecock and other Algonquin tribal villages is legally sufficient to establish exclusive use in waters within New York's now-existing 3-mile jurisdictional boundary. This is analogous to cases in which common areas used by multiple tribal villages who each are a landholding entity were determined to be "exclusive" use of the common areas – regardless of the fact that each village occupied lands of its own.

*See, e.g.*, *Muckleshoot Tribe v. United States*, 3 Ind. Cl. Comm. 669, 674-75 (1955) (recognizing aboriginal rights where Indians in an area "consisted of separate, distinct and autonomous villages, each such village or settlement having the exclusive use (in the sense that members of other villages could use same only with the permission of the permanent occupants thereof) of their village settlement area" and "fishing waters were used in common by the occupants of all the villages"), JA-690–JA-691; *Suquamish Tribe v. United States*, 5 Ind. Cl. Comm. 158, 164 (1957) (recognizing aboriginal rights where villages "spoke a common dialect and had a common culture, and they shared gathering, fishing, and hunting areas which were contiguous to their immediate village areas"), JA-704; *Upper Skagit v. United States*, 8 Ind. Cl. Comm. 492, 497 (1960) (recognizing aboriginal rights where villages "extracted their principal sustenance from the same areas"), JA-711.

## IV.    Aboriginal Shinnecock Fishing Rights Have Not Been Extinguished.

Having satisfied the legal criteria for establishing aboriginal Shinnecock fishing rights, the only remaining question is whether any "discovering" sovereign has extinguished them. The answer is no. Supreme Court precedent confirms that aboriginal rights continue to exist until a sovereign takes "plain and unambiguous action" intended to extinguish such rights and exercises "complete dominion adverse to the right of occupancy." *Santa Fe Pac.*, 314 U.S. at 346-47. Any "doubtful

expressions" of a sovereign's intent to extinguish aboriginal rights are resolved in the Indians' favor. *Id.* at 354.

Only the so-called "discovering" sovereign can extinguish aboriginal rights, which was "first the discovering European nation and later the original States and the United States." *Oneida Indian Nation v. Oneida Cty.*, 414 U.S. 661, 667 (1974). During the colonial era, Great Britian held the right of extinguishment of Indian aboriginal rights. *Oneida Indian Nation v. New York*, 860 F.2d 1145, 1150 (2d Cir. 1988). In 1644, the "Towne of Southampton" was accepted into the jurisdiction of the British Colony of Connecticut. JA-197. In 1664, Long Island became part of the British Colony of New York.  JA-199.

In 1781, with the adoption of the United States' Articles of Confederation, the United States became the sovereign with exclusive authority over Indian affairs, which granted Congress the "sole and exclusive right and power of … managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated." Articles of Confederation of 1781, art. IX, ¶ 4. "With the adoption of the Constitution, Indian relations became the exclusive province of federal law." *Oneida Cty. v. Oneida Indian Nation*, 470 U.S. 226, 234 (1985). The first Congress passed the Non-Intercourse Act of 1790, which prohibited any transfer of title to Indian lands to any person or state "whether having the right of pre-emption to such lands

or not" unless the federal government consented to the transaction. Act of July 22, 1790, § 4, 1 Stat. 137 (1790) (current version codified at 25 U.S.C. § 177).

In sum, Defendants do not reference any affirmative act by a "discovering" sovereign that purports to extinguish aboriginal Shinnecock fishing rights in a clear and unambiguous manner. Defendants rely entirely on historical documents *completely* silent about Shinnecock fishing rights, that address *fee title* ownership to lands in and around the Town of Southampton, and that deal generally with mere regulatory authority over public waters and marine resources. The colonial-era deeds and land patents relied upon by Defendants all pertain to landlocked areas, and do not encompass any ocean waters, let alone purport to extinguish Shinnecock fishing rights.

### A. The District Court Improperly Relied on *Shinnecock Indian Nation* to Imply the Extinguishment of Shinnecock Fishing Rights.

The district court below did not point to any single source by an alleged "discovering" sovereign evidencing *any* "plain and unambiguous" intent to extinguish aboriginal Shinnecock fishing rights. Instead, the district court relied entirely on then-District Judge Bianco's vacated decision in *Shinnecock Indian Nation* as "highly persuasive" authority to imply without deciding that certain land transactions and land patents in the 17th Century extinguished aboriginal Shinnecock fishing rights. *See* SPA-5. The district court's reliance on *Shinnecock Indian Nation* was misplaced and incorrect as a matter of law.

41

First, this Court vacated *Shinnecock Indian Nation* for lack of federal subject matter jurisdiction. *New York v. Shinnecock Indian Nation*, 686 F.3d 133, 142 (2d Cir. 2012) ("[W]e conclude that federal subject matter jurisdiction over this action is absent."). While the district court characterized *Shinnecock Indian Nation* as merely "vacated on other grounds," vacatur for lack of federal subject matter jurisdiction precludes later reliance on *any* grounds for relief. *See Behrens v. JPMorgan Chase Bank, N.A.*, 96 F.4th 202, 207 (2d Cir. 2024) ("If a federal court lacks jurisdiction, it has no adjudicative power to hear the parties' dispute, and any relief it grants 'would be void.'") (citation omitted). Further, the general rule is that "[a] vacated judgment has no effect." *Fort Knox Music*, 257 F.3d at 110. A vacated decision also lacks any precedential force. *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 68 (2d Cir. 2013) ("[V]acatur dissipates precedential force."). The district court's reliance on *Shinnecock Indian Nation* as merely "vacated on other grounds" and "highly persuasive" authority is thus erroneous.

Second, even if *Shinnecock Indian Nation* had any precedential effect, it is wholly unrelated to this case and has no bearing on whether aboriginal Shinnecock fishing rights remain intact. *Shinnecock Indian Nation* involved the specific question of whether the Shinnecock hold unextinguished "aboriginal title" to a parcel of land commonly known as "Westwoods." 523 F. Supp. 2d at 188-89. Then-District Judge Bianco determined that historical documents establish "the sale of the land by the

Shinnecock Nation and repeated approval and confirmation of this conveyance of title to Southampton by various New York Provincial Governors, acting under the authority of the British Crown." *Id.* at 266. The case had nothing to do with aboriginal fishing rights; it did not even address questions of water-based rights in any way. Additionally, in relying on *Shinnecock Indian Nation*, as discussed below, the district court below completely ignored the body of case law recognizing that aboriginal use rights can exist even if aboriginal title to land has been extinguished.

Third, all of the above notwithstanding, changed circumstances and new facts involving the Nation's Westwoods property cast further doubt on *Shinnecock Indian Nation*'s persuasive value. The outcome of *Shinnecock Indian Nation* was premised on Westwoods' lack of federally-protected restricted fee status. 523 F. Supp. 2d at 195 ("The Nation currently has fee simple title to Westwoods…. Westwoods does not appear in the records of the [Bureau of Indian Affairs] as Indian fee land, the title to which is restricted against alienation in accordance with 25 U.S.C. § 177."). In 2025, the U.S. Department of the Interior determined that Westwoods is indeed federally-protected restricted fee land. Letter from Bryan Newland, JA-668. For all these reasons, the district court erred in putting any weight or persuasive value on *Shinnecock Indian Nation* for purposes of addressing aboriginal Shinnecock fishing rights in New York waters.

43

### B. No Colonial-Era Document Extinguished Aboriginal Shinnecock Fishing Rights.

In the 17th Century, the English sought to purchase Indian lands through deeds though these transactions were long shadowed by legal uncertainty. Shinnecock history exemplifies a series of deeds purporting to convey title to specific parcels of lands in and around the Town of Southampton. Even if these transactions were legally valid, the transfers of land title did not affect the Shinnecock's underlying aboriginal fishing rights.

#### 1. Aboriginal Shinnecock Fishing Rights Do Not Depend on Title to Land or Waters.

Plaintiffs are not claiming any *title* to Long Island waters or submerged lands. Plaintiffs instead seek the recognition of complementary rights: non-exclusive fishing rights based on the Shinnecock's aboriginal right of use and occupancy that has always been a counterpart to – and not the displacement of – sovereignty over the "discovered" territory. This Court has clarified that Plaintiffs' remaining claim does not amount to a disruptive land claim, nor would it displace New York's regulatory jurisdiction. *See Silva*, 47 F.4th at 85.

"[T]he right of use and occupancy by Indians … is not the same as sovereign or legal title." *Sac & Fox Tribe*, 383 F.2d at 997. "[T]he right of sovereignty over discovered land was always subject to the right of use and occupancy and enjoyment of the land by Indians living on the land." *Id.* Aboriginal rights can coexist with

third-party fee title, even in cases of "simultaneous use and occupancy," because the traditional use of land by a tribe and its members "differ[s] significantly from the occupancy of settlers." *Pueblo of Jemez*, 790 F.3d at 1165. Indeed, literal ownership of land or waters is not necessary to establish aboriginal rights in the first place. *See Seminole Indians*, 180 Ct. Cl. at 384-85 (affirming "the 'use and occupancy' essential to the recognition of Indian title does not demand *actual* possession of the land, but may derive through intermittent contacts" such as hunting and trade).

"[T]he ownership of land under navigable waters is an incident of sovereignty." *Montana v. United States*, 450 U.S. 544, 551 (1981). States' fee title ownership of waters and submerged lands within the 3-mile boundary from the State's coastline has been confirmed by Congress. In the Submerged Lands Act, 43 U.S.C. § 1301, *et seq.*, Congress "extended the boundaries of Coastal States up to three geographic miles into the Atlantic and Pacific Oceans." *Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207, 211-12 (2012). The Submerged Lands Act "restored the rights to the submerged land and its resources to individual states." *Michigan*, 471 F. Supp. at 275. However, "[n]either the language of the Act nor its purposes are in conflict with the Indians' retention of fishing rights," and "[t]he state may own the resources of these lands, even the fish, but this does not necessarily abrogate the Indians' right to fish." *Id.* at 276.

In *People of Village of Gambell v. Hodel*, 869 F.2d 1273, 1276-77 & n.3 (9th Cir. 1989), the Ninth Circuit addressed whether Alaska Native Villages' aboriginal fishing and hunting rights offshore on the Outer Continental Shelf ("OCS")— defined as the submerged lands lying beyond state coastal waters of 3 miles offshore—were extinguished, by among other things, the United States' paramount interests in the OCS, including oil and gas leasing. *Id.* at 1276.

The Ninth Circuit clarified that the Villages' non-exclusive aboriginal fishing rights claim is "not asserting a claim of sovereign rights" but rather a claim "assert[ing] merely a right to occupy and use, rather than title to" waters and submerged lands." *Id.* at 1276-77 & n.3 ("[W]e reverse the district court and hold that the federal government's paramount interests in the OCS do not extinguish the asserted aboriginal rights of the Villages."). Plaintiffs here assert a related non-exclusive, non-possessory aboriginal right to fish that is a right to occupy and use rather than title to New York waters and submerged lands.

Even in the non-Indian fishing context, the U.S. Supreme Court's decision in *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265 (1977) is further instructive on how fishing rights protected under federal law are fully compatible and can coexist with state ownership and title of submerged lands. In *Douglas*, the Supreme Court invalidated a Virginia state law barring foreign corporations from obtaining

commercial fishing licenses in Virginia and nonresidents of Virginia from catching menhaden in the Virginia portion of the Chesapeake Bay. *Id.* at 283-86.

The Supreme Court rejected the argument that Virginia's "ownership" of fish in its territorial waters empowered to the State to prohibit fishing by federally-licensed ships owned by nonresidents. *Id.* at 283-84. The Court explained that while the Submerged Lands Act gives states "title," "ownership," and "the right and power to manage, administer, lease, develop, and use" "the lands beneath the oceans and natural resources in the waters within state territorial jurisdiction," it did not preempt or repeal fishing rights granted to federal licensees. *Id.* Consistent with the conservation necessity doctrine, the Court concluded that federally-licensed fishermen have the right to "tak[e]" fish "in state waters" "subject to valid state conservation regulation." *Id.* at 282; *Michigan*, 471 F. Supp. at 276 ("Seacoast Products makes clear that a federal license to fish does not interfere with the state's rights.").

## 2. The Transfer of Land Title to Non-Indians Does Not Affect Underlying Aboriginal Rights.

Any transfer of fee title to Long Island lands and waters in the 17th Century did not extinguish aboriginal Shinnecock fishing rights based on the Indian right of use and occupancy. "[A]ll European land grants were issued subject to the Indians' possessory and occupancy rights." *Alabama-Coushatta Tribe*, 2000 WL 1013532, at *10. "Although charters and patents granted by European monarchs customarily

contained sweeping assertions of legal title to land in the Western Hemisphere, the primary purpose of such grants was to prevent encroachment by other European powers. The 'right of discovery' gave a European nation the sole authority to acquire the specified land from its native inhabitants and to establish settlements. It did not affect the possessory rights of the aboriginal inhabitants." Cohen's Handbook § 1.02[1], at 12-13.

*Santa Fe Pacific*—a leading case on extinguishment—illustrates how a grant of Indian-occupied land does not, by itself, extinguish the Indian right of occupancy and accompanying tribal rights. In *Santa Fe Pacific*, the United States sued a railroad company, claiming the Walapai Tribe's right of occupancy to its homelands was not extinguished. 314 U.S. at 343-47. The Supreme Court rejected the railroad company's argument that actions of Congress in 1865 establishing a reservation for the tribe outside its aboriginal homelands and inviting the tribe to move to that reservation – which the tribe refused – extinguished the tribe's right of occupancy, because it did not constitute a "voluntary cession" of tribal land. *Id.* at 355.

Instead, the Court held that the tribe's right of occupancy to lands outside its reservation – which the Walapai asked for and accepted – had been extinguished by a later executive order in 1883 establishing a reservation for the tribe within its aboriginal territory. *Id.* at 356-58. It explained that "[i]f the right of the Walapais was not extinguished … then the [railroad's] predecessor took the fee subject to the

encumbrance of Indian title." *Id.* at 347. The Court noted the distinction between tribal claims to land and individual rights of occupancy: "the relinquishment of any tribal claims to land" is "distinguished from individual rights of occupancy," which "are not foreclosed or affected by the judgment in [a] case" regarding the relinquishment of claims to tribal lands. *Id.* at 357-58 & n.23.

Many other cases confirm that a land grant made by a sovereign to a third-party is made subject to the Indian right of occupancy, and does not extinguish aboriginal use rights. *See, e.g.*, *Chouteau v. Molony*, 57 U.S. (16 How.) 203, 239 (1853) (holding that land grants by Spanish colonial governors were made "subject to the rights of Indian occupancy" and "did not take effect until that occupancy had ceased, and whilst it continued it was not the power of the Spanish Governor to authorize any one to interfere with it"); *Buttz v. N. Pac. R.R. Co.*, 119 U.S. 55, 66-67 (1886) ("The grant conveyed the fee subject to this right of occupancy. The railroad company took the property with this [e]ncumbrance. The right of Indians, it is true, could not be interfered with or determined except by the United States."); *Cramer*, 261 U.S. at 229 (holding that a grant to railroad did not extinguish Indian right of occupancy); *Pueblo of Jemez*, 790 F.3d at 1162-63 (holding that the United States' grant of land occupied by the Jemez Pueblo, but deemed "vacant" by the Surveyor General, could not extinguish the Pueblo's right of occupancy).

The district court below was wrong to assume that any purported transfer of land title in the 17th Century, even if presumed valid, extinguished the Shinnecock's underlying water-based aboriginal fishing rights.

### 3. The 1640 Deed to Southampton Did Not Extinguish Shinnecock Fishing Rights.

The 1640 Deed to Southampton purported to convey from the Shinnecock to English colonists title to *lands* bounded on the west by "the place where the Indians hayle over their canoes out of the North bay to the south side of the Island," lands commonly known as Canoe Place. JA-446–JA-448. The area encompassed within the 1640 Deed is entirely landlocked, as the boundaries end of the water: "all the lands lying eastward between the forsaid bounds by water, to wit, all the lands lying eastward between the foresaid bounds by water, to wit, all the land pertaining to the parteyes aforesaid." JA-447. The 1640 Deed does not encompass the Shinnecock Bay estuary, or any ocean waters.[5]

Even if its geographic scope covered ocean waters, the 1640 Deed does not mention aboriginal fishing rights, and it cannot as a matter of law operate to extinguish Shinnecock rights by silence. The extinguishment of aboriginal rights cannot be "lightly implied" and any "doubt whether" such rights are "validly

---

[5] To the extent that the 1640 Deed encompasses any waters by its reference to "all lands, woods, waters," this would be limited in geographic scope of the fresh waters actually encompassed within the 1640 area.

extinguished … [must] be resolved in favor of the Indians." *Pueblo of Jemez*, 790 F.3d at 1162 (quoting *Santa Fe Pac.*, 314 U.S. at 354).

In Defendants' expert's view, the 1640 Deed "did not reserve access to fishing," and thus those rights can no longer exist. JA-228. Not so. Aboriginal rights do not originate in any treaty, agreement, or other formal governmental act, but rather exist inherently. *See Santa Fe Pac.*, 314 U.S. at 347. In a mirror to this concept, and consistent with the requirement that the "discovering" sovereign must be "plain and unambiguous" when it extinguishes aboriginal rights, there is also no requirement that aboriginal rights be explicitly retained in language in any historical record to continue to exist. *See Lipan Apache Tribe v. United States*, 180 Ct. Cl. 487, 492 (Ct. Cl. 1967) ("[A]boriginal possession does not depend upon sovereign recognition or affirmative acceptance for its survival" and "[o]nce established in fact, it endures until extinguished or abandoned.").

### 4. Purported Land Sales to Individual Colonists From 1648 to 1662 Did Not Extinguish Shinnecock Fishing Rights.

None of the purported land sales to individual colonists—including the 1648 Deed to East Hampton, the 1658 Deed to Beach, the 1659 Quogue Purchase, the 1659 Deeds between Wyandanch and Lion Gardiner, and the 1662 Topping Purchase—ceded away or extinguished Shinnecock fishing rights. There is no language in any of these deeds purporting to cede or extinguish fishing rights. JA-947–JA-950; JA-956–JA-957; JA-959–JA-960; JA-962–JA-964; JA-965–JA-968;

JA-970–JA-971; JA-973–JA-974. Rather, these deeds contain language indicating the Shinnecock's intent to retain their ability to fish and use marine resources as they have done since time immemorial. JA-591. Moreover, these deeds were executed on behalf of private individuals, all of whom acted without sovereign or royal approval. JA-1046–JA-1053. Clearly, these deeds would not constitute affirmative acts by a sovereign with the authority to extinguish aboriginal Shinnecock fishing rights.

### 5. The 1666 Nicolls Determination, 1676 Andros Patent, and the 1686 Dongan Patents Did Not Extinguish Shinnecock Fishing Rights.

Through a series of 17th-Century land determinations and patents, New York colonial governors took steps to authorize property rights in Southampton. None of these actions altered Shinnecock's aboriginal rights because they solely concerned the claims of Europeans—the English Crown, the Town of Southampton, and English settlers—as against each other. Title among non-Indians does not affect the underlying aboriginal rights of Indians. *See Worcester*, 31 U.S. at 546; *Johnson*, 21 U.S. at 574 ("These grants have been understood by all, to convey a title to the grantees, subject only to the Indian right of occupancy.").

These land determinations and patents do not mention Shinnecock fishing rights—much less contain clear and unambiguous language purporting to extinguish Shinnecock fishing rights. Like the Indian deeds, the land determinations and patents were limited to their stated borders, which excluded Shinnecock Bay, Great Peconic

Bay, and the Atlantic Ocean, and thus, were subject to the presumption against exclusive fishery.

*1666 Nicolls Determination*. Governor Richard Nicolls required all existing land claims to be submitted for confirmation. *See* The Duke of York's Laws (1665). Through this process, Governor Nicolls reviewed Shinnecock land sales to individual settlers, which had resulted in overlapping claims between Southampton, which acquired John Ogden's land; John Cooper, who purchased land from Lion Gardiner; and Thomas Topping. *See* JA-198–JA-199. In the determination, Governor Nicolls determined that "all the right and interest that ye said Capt. Thomas Topping" "is belonging, doth and shall belong unto of Southampton … and their successors forever." JA-977–JA-979. The Nicolls Determination encompassed a landlocked area, and did not include any ocean and bay waters or anything related to Shinnecock fishing rights. No language in the Nicolls Determination expresses any plain and unambiguous intent to extinguish aboriginal Shinnecock fishing rights. *See Santa Fe Pac.*, 314 U.S. at 354.

*1676 Andros Patent*. In 1676, the Town of Southampton submitted its Indian deeds for review by Governor Andros. The resulting Andros Patent defined the boundaries of Southampton and "Confirmed and granted" to the Town's proprietors and inhabitants "[a]ll the aforementioned Tract of Land, … with the Rivers, Lakes waters Quarrys Wood land Plaines Meadows, pastures, Marshes, ffishing, Hawking

Hunting and ffowling, and all other Proffits, Commodities, Emoluments and Hereditaments." JA-992. No language in the Andros Patent purports to extinguish Shinnecock fishing rights. The patent legitimized Southampton's existing claims to the land within its borders under the English Crown. It did nothing to alter the terms of the original Indian deeds or Shinnecock fishing rights.

*1686 Dongan Patent*. In 1686, after reviewing Southampton's documents and securing confirmation of earlier sales from the Shinnecock, Governor Dongan issued a new patent with near-identical language to the Andros Patent. The Dongan Patent reaffirmed Southampton's title to the lands within its boundaries described in the Andros Patent. JA-994–JA-1000. The Dongan Patent also addressed a dispute between the Shinnecock and Southampton over additional lands, finding that these lands had been lawfully purchased from the Shinnecock by Southampton. JA-995.

The language in the Dongan Patent conveying to the freeholders and inhabitants of the Town of Southampton the "Rivers Rivolets waters lakes ponds Brookes streames beache … Creeks harbors" and providing easements for "fishing hawking hunting and fowling," JA-994–JA-996, does not in any way extinguish Shinnecock fishing rights. As Defendants' expert points out, Southampton's March 1639 founding documents—shortly before the first English colonists arrived on eastern Long Island—declared that: the "ffreedom of fishing, fowling and navigation shall be common to all within the banks of the said waters whatsoever." JA-196. The

common right of access to navigable waters for fishing and other marine activities was unquestionably nothing new when the Andros and Dongan Patents took place as this concept was simply imported directly from English common law.

"[T]he public and common right of fishery in navigable waters, … has been so long and so carefully guarded in England, and … was preserved in every other colony founded on the Atlantic borders." *Martin v. Waddell's Lessee*, 41 U.S. (16 Pet.) 367, 414 (1842). "Not surprising, American law adopted as its own much of the English law respecting navigable waters, including the principle that submerged lands are held for a public purpose." *Coeur d'Alene*, 521 U.S. at 284; *PPL Mont., LLC v. Montana*, 565 U.S. 576, 603 (2012) ("The public trust doctrine … traces to Roman civil law and its principles can be found in the English common law on public navigation and fishing rights over tidal lands and in the state laws of this country.").

Such language concerning the public and common right of fishing in navigable waters contained in statutes or regulations—such as the language in the Andros and Dongan Patents—was "not necessary to create or preserve these rights," and constituted a normal reflection of the common law at the time. Bethany R. Berger, *Property and the Right to Enter*, 80 Wash. & Lee L. Rev. 71, 97 (2023). The language in the Andros and Dongan Patents merely reciting the English common law public right to fishing in navigable waters does not serve as any plain and unambiguous intent to extinguish Shinnecock fishing rights.

Furthermore, any control over the fishery management assigned to Southampton in the Andros and Dongan Patents did not extinguish Shinnecock fishing rights. Mere regulatory authority over natural resources held by any government, by itself, has never been found to be a source of extinguishment of non-exclusive tribal rights to the same resources. The Tenth Circuit's decision in *United States v. Abouselman*, 976 F.3d 1146 (10th Cir. 2020) is instructive on this point. In *Abouselman*, the Tenth Circuit held that the Pueblos continue to hold aboriginal water rights despite "Spain's control of water" in which "public waters were held in common and shared by everyone" and "one could not use public waters to the detriment of other users." *Id.* at 1155.

The issue in *Abouselman* was whether the laws of Spain unambiguously expressed Spain's intent to extinguish the Pueblo's aboriginal water rights, even though Spain made no affirmative act. *Id.* at 1152. When Spain arrived at the Jemez River Basin in 1598, it brought with it the concept of "regalia," or the royal prerogative over natural resources, including water. *Id.* at 1154. Thus, the crown had the power to grant dominion over water, but it often allowed local authorities to oversee the distribution of resources and to respect and protect Indian rights to property. *Id.* In applying *Santa Fe Pacific*, the Tenth Circuit held that Spain's actions provided no indication, "let alone a clear and plain indication," that Spain intended to extinguish the Pueblo's aboriginal water rights. *Id.* at 1158-60.

56

Similarly, here, any passive control of the fisheries by Southampton did not extinguish Shinnecock fishing rights. The rights of a "discovering" sovereign to natural resources have always been able to coexist with aboriginal Indian rights: "[T]he right of sovereignty over discovered land was always subject to the right of use and occupancy and enjoyment of the land by Indians living on the land." *Sac & Fox Tribe*, 383 F.2d at 997. Defendants fail to show any evidence of a sovereign through a clear and affirmative statement attempting to enforce either the Andros or Dongan Patents in a manner adverse to Shinnecock fishing rights. *See Abouselman*, 976 F.3d at 1160. Defendants' historical expert concedes this point as well. JA-331–JA-333. The Andros and Dongan Patents, therefore, do nothing to extinguish aboriginal Shinnecock fishing rights.

### 6. The 1703 Lease Did Not Extinguish Shinnecock Fishing Rights.

In a deed related to the 1703 Lease, the Shinnecock confirmed that it would "give grant Remise Release and for ever Quit Claim unto ye said Trustees … all such Right, Estate, title, Interest and Demand whatsoever, as they … and their people had or out [ought] to have of in or to all that tracte of Land of ye township of Southampton." JA-1003. The 1703 Lease did not encompass any ocean waters, or Shinnecock rights relating to the use of waters or fishing. As stated by Defendants' historical expert, "[t]here is nothing in th[e] 1703 lease that denies fishing rights to the Shinnecock." JA-334. Additionally, the Town of Southampton was not the

relevant "discovering" sovereign in 1703, and did not hold any right of preemption necessary to extinguish tribal rights. *See Oneida*, 414 U.S. at 667.

## V. Alleged Equitable Defenses Do Not Extinguish Aboriginal Shinnecock Fishing Rights.

Defendants' reliance on *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005), to contend that Plaintiffs' remaining claim for relief is "disruptive" based on equitable principles is clearly wrong and flips equity on its head. In *Sherrill*, the Supreme Court held that the equitable doctrine of "laches" barred a tribe from relying on its "sovereign control" to assert "immunity from local taxation on parcels … purchased in the open market" within its reservation. *Id.* at 214. The Court reasoned that "the extraordinary passage of time" during which the land was subject to state regulatory control and taxation created "settled expectations" that trigged the doctrine of laches to avoid the "disruptive remedy" of restoring the tribe's inherent sovereignty over the newly purchased parcels of land. *Id.* at 217-18.

This Court has rejected a broad reading of *Sherrill*, clarifying that "the Court's holding in *Sherrill* pertains to a tribe's immunity from taxation—*e.g.*, whether a state or local authority has the power to *impose* real property taxes on tribal lands." *Cayuga Indian Nation of N.Y. v. Seneca Cty.*, 978 F.3d 829, 841 (2d Cir. 2020) (emphasis in original). *Sherrill* is totally irrelevant here because Plaintiffs do not seek to reestablish the Shinnecock's exclusive jurisdiction over the waters or submerged lands at issue. *See Silva*, 47 F.4th at 85.

58

## CONCLUSION

The district court's decision granting summary judgment in favor of Defendants' favor should be reversed.

Dated: March 4, 2026                         Respectfully Submitted,

                                             */s/ Joseph Plumer*
                                             Joseph Plumer
                                             Riley Plumer
                                             Plumer Law Office
                                             9352 N Grace Lake Rd SE
                                             Bemidji, MN 56601
                                             (218) 556-3824

                                             *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume litigation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because this brief contains 13,989 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2021, Times New Roman 14-point font.

Dated: March 4, 2026        By: *_/s/ Joseph Plumer_*
                                  Joseph Plumer

# SPECIAL APPENDIX

## TABLE OF CONTENTS

**Page**

Memorandum of Decision and Order of the Honorable Gary B. Brown, dated October 3, 2025 Appeal From ................................................................................................................. SPA-1

Judgment entered October 6, 2025 Appeal From ................................................................. SPA-7

SPA-1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
DAVID T. SILVA, GERROD T. SMITH, AND
JONATHAN K. SMITH, Members of the Shinnecock
Indian Nation,

                                        Plaintiffs,


            -against-



BRIAN FARRISH, JAMIE GREENWOOD,
EVAN LACZI, BASIL SEGGOS, NEW YORK
STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION, and SUFFOLK COUNTY
DISTRICT ATTORNEY'S OFFICE,

                                        Defendants.
------------------------------------------------------------X

**FILED**
**CLERK**

10/3/2025 2:48 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF**
**DECISION AND ORDER**

Civil Action
No. 18-3648 (GRB) (SIL)

**GARY R. BROWN, United States District Judge**:

Presently before this Court are cross-motions for summary judgment pursuant to Federal

Rule of Civil Procedure 56 brought by plaintiffs David Silva, Gerrod Smith, and Jonathan Smith,

who are members of the Shinnecock Indian Nation, and defendants Basil Seggos, Brian Farrish,

and Evan Laczi, all of whom are officers with the New York State Department of Environmental

Conservation.  *See* Docket Entries ("DE") 161-11, 162-1.  Plaintiffs seek (i) a declaratory

judgment that as members of the Shinnecock Indian Nation they retain aboriginal rights to fish in

New York waters and (ii) an injunction against New York state officials to prevent unreasonable

interference with these supposed aboriginal fishing rights. DE 161-11 at 9.  For the reasons set

forth herein, defendants' summary judgment motion is GRANTED and plaintiffs' summary

judgment motion is DENIED.


            ***Factual Background***

SPA-2

This case concerns whether members of the Shinnecock Indian Nation, a federally recognized Indian tribe, based on the Shinnecock Indian Reservation in Suffolk County, have a right to fish off-reservation free from state regulations that seek to preserve local fisheries.

In 2017, plaintiff Silva was convicted in New York state court for eel fishing without a commercial fishing license and for using a fyke net in Shinnecock Bay.[1]  DE 126-1 ¶ 37.  All of Silva's predicate conduct occurred outside the boundaries of the Shinnecock Reservation.  *Id.* ¶¶ 20, 32-35.  The state had prosecuted plaintiff Gerrod Smith in 2008 for illegal possession of flounder, porgy, and blackfish harvested from Shinnecock Bay.  And plaintiff Jonathan Smith had received a civil infraction ticket and a criminal summons for operating an unpermitted aquaculture facility in Shinnecock Bay and using improper shellfish tags.  These latter two cases were dismissed.  DE 89 at 3.

The State of New York has implemented a variety of regulations to protect aquatic species, including—and most relevant to this case—the American eel.  The Atlantic Coastal Fisheries Cooperative Management Act ("ACFCMA") requires states to implement measures that the Atlantic States Marine Fisheries Commission ("ASMFC") deems necessary for conservation of coastal fisheries.  DE 162-1 at 38.  New York, like every state that borders the Atlantic Ocean, is a member of the ASMFC.  *Id.*  Due to the decreasing American eel population, the ASMFC developed a fishery management plan (FMP) in 1999 "to ensure the long-term viability of the population for continued harvest and provide adequate quantities of juveniles and

---

[1] A fyke net is used for trapping fish in shallow waters and consists of several "cone-shaped netting bags."  *See* Fishing Gear Type: Fyke Nets, Food and Agriculture Organization of the United Nations, https://www.fao.org/fishery/en/geartype/226/en.

adults for use by other fish and wildlife resources." *Id.* New York implements its obligations under the American Eel FMP, in part, through the challenged regulations limiting eel fishing. *Id.*

New York's interest in maintaining the American eel population is straightforward. The American eel "is a protected resource, whose population is depleted and at historically low levels," in part due to overfishing. DE 126-1 ¶¶ 38, 53. Conservation of eel species is essential for maintaining food chains in aquatic ecosystems and protecting species for whom eel is an important food source, such as various fish, birds, and mammals. *Id.* ¶¶ 78-80. Maintaining an adequate American eel population supports recreational and commercial fisheries, which in turn provides direct and indirect employment opportunities in industries such as gear manufacturing, food processing, and shipping. DE 127-5 at 8.

Plaintiffs filed suit in 2018, arguing that they—as members of the Shinnecock Nation— have aboriginal rights to fish in Shinnecock Bay. *See* DE 1. Then-Judge Feuerstein granted summary judgment to defendants, finding that Silva's claims were precluded under *Younger* abstention, sovereign immunity barred this suit, and Gerrod Smith and Jonathan Smith lacked standing. *See* DE 96. The Second Circuit reversed, holding that *Younger* did not apply, the *Ex Parte Young* doctrine provided an exception to sovereign immunity, and the threat of enforcement of fishing regulations gave Gerrod Smith and Jonathan Smith standing. *See Silva v. Farrish*, 47 F.4th 78 (2d Cir. 2022).

### *Discussion*

#### *Standard of Review*

This motion for summary judgment is decided under the oft-repeated and well understood standard for review of such matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F.

SPA-4

Supp. 3d 198, 211 (E.D.N.Y. 2015), *aff'd sub nom. Bartels v. Schwarz*, 643 Fed. App'x. 54 (2d

Cir. 2016), which discussion is incorporated by reference herein.

*Discussion*

Despite the lengthy filings, request for extending page limits in the briefs even after the

Court granted the parties additional pages, DE 135, and submissions by numerous amici, *see* DE

152; DE 154; DE 159; DE 160, this case remains straightforward. The main question is whether,

regardless of any aboriginal title, the state fishing regulations at issue are reasonable and non-

discriminatory.

Under the doctrine of conservation necessity, "[s]tates can impose reasonable and

nondiscriminatory regulations on an Indian tribe's treaty-based hunting, fishing, and gathering

rights on state land when necessary for conservation." *Herrera v. Wyoming*, 139 S. Ct. 1686,

1695 (2019). The conservation necessity doctrine requires a state to show that "the regulation

meets appropriate standards and does not discriminate against the Indians," and that "its

regulation is a reasonable and necessary conservation measure, and that its application to the

Indians is necessary in the interest of conservation." *Antoine v. Washington*, 420 U.S. 194, 207

(1975). With regard to fishing rights, the Supreme Court has held that "the manner of fishing,

the size of the take, the restriction of commercial fishing, and the like may be regulated by the

State in the interest of conservation, provided the regulation meets appropriate standards and

does not discriminate against the Indians." *Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S.

392, 398 (1968). In a case that the Second Circuit upheld earlier this year, in which members of

the Unkechaug Tribe challenged these same American eel regulations, Judge William Kuntz

granted summary judgment for the state, finding that New York "has a clear interest in

conserving the American eel population, and it has imposed reasonable, non-discriminatory

SPA-5

regulations in furtherance of this interest." *Unkechaug Indian Nation v. New York State Dep't of Env't Conservation*, 677 F.Supp.3d 137, 160 (E.D.N.Y. 2023*), aff'd sub nom. Unkechaug Indian Nation v. Seggos*, 2025 WL 310163 (2d Cir. Jan. 28, 2025).

Judge Kuntz's opinion confirms what is evident. The state developed its American eel fishing regulations pursuant to its obligations under a compact with other states. The regulations were implemented to ensure biodiversity and maintain food chains, which help other organisms in those ecosystems survive. Maintaining the eel population—and by extension ensuring the survival of other fish, mammals, and birds—benefits recreational and commercial fisheries, which provide employment opportunities and play a vital role in numerous industries. DE 127-5 at 8. Plaintiffs do not dispute that the state applies these regulations in a nondiscriminatory manner. Accordingly, the conservation necessity doctrine requires that the Court grant summary judgment for defendants.

While the Court need not reach the question of aboriginal rights, the Court finds then-District Judge Joseph Bianco's opinion in *New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185 (E.D.N.Y. 2007), *vacated on other grounds*, 686 F. 3d 133 (2d Cir. 2012) to be highly persuasive. Judge Bianco found that 17th century land purchases by British colonists and subsequent royal proclamations demonstrate an "extinguishment of aboriginal title" in present-day South Hampton (which is where Shinnecock Bay is located) because "[n]either the language nor the context of the colonial era documents is ambiguous in any way; rather, the documents reflect a clear and compelling historical record establishing the sale of the land by the Shinnecock Nation and the repeated approval and confirmation of this conveyance of title to Southampton by various New York Provincial Governors, acting under the authority of the

5

SPA-6

British Crown." *Id.* at 265-66. Judge Bianco's well-reasoned determination undermines plaintiffs' arguments that they have aboriginal title to fish in Shinnecock Bay.

Based on the extensive record, the Court finds it undisputed that the eel fishing regulations at issue have a valid and non-discriminatory purpose. The Court also finds it undisputed that plaintiffs lack aboriginal fishing rights in Shinnecock Bay.

### *Conclusion*

For the reasons set forth herein, the Court grants defendants' motion for summary judgment and denies plaintiffs' motion for summary judgment.

**SO ORDERED.**

Dated: Central Islip, New York
       October 3, 2025

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge

SPA-7

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
DAVID T. SILVA, GERROD T. SMITH, and
JONATHAN K. SMITH, Members of the
Shinnecock Indian Nation,

               Plaintiffs,

                                             **JUDGMENT**
                                             CV 18-3648 (GRB)(SIL)

     - against -

BRIAN FARRISH, JAMIE GREENWOOD,
EVAN LACZI, BASIL SEGGOS, NEW
YORK STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and SUFFOLK COUNTY DISTRICT
ATTORNEY'S OFFICE,

               Defendants.
-----------------------------------------------------------X

      A Memorandum of Decision and Order of Honorable Gary R. Brown, United States

District Judge, having been filed on October 3, 2025, granting defendants' motion for summary

judgment, and denying plaintiffs' motion for summary judgment, it is

      **ORDERED AND ADJUDGED** that plaintiffs David T. Silva, Gerrod T. Smith and

Jonathan K. Smith take nothing of defendants Brian Farrish, Jamie Greenwood, Evan Laczi,

Basil Seggos, New York State Department of Environmental Conservation, and Suffolk County

District Attorney's Office; that defendants' motion for summary judgment is granted; that

plaintiffs' motion for summary judgment is denied; and that this case is closed.

Dated: October 6, 2025
       Central Islip, New York

                                     BRENNA B. MAHONEY
                                     CLERK OF COURT
               By:   /s/ James J. Toritto
                                       Deputy Clerk