# 25-2826

## United States Court of Appeals
## for the Second Circuit

DAVID T. SILVA, GERROD T. SMITH, JONATHAN K. SMITH,
MEMBERS OF THE SHINNECOCK INDIAN NATION,

*Plaintiff-Appellants*,

v.

BRIAN FARRISH, JAMIE GREENWOOD, EVAN LACZI,
NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION,
SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE, BASIL SEGGOS,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of New York

## BRIEF FOR STATE APPELLEES

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for State Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6167

BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
ELIZABETH A. BRODY
*Assistant Solicitor General*
*of Counsel*

Dated: June 3, 2026

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

ISSUES PRESENTED ..... 3

STATEMENT OF THE CASE ..... 4

A. Legal Background ..... 4

B. Factual Background ..... 9

1. The Shinnecock Indian Nation's ceded lands ..... 9

2. The state-federal regulatory framework protecting the American eel and other species ..... 11

3. The American eel and its decline ..... 12

C. This Case ..... 15

1. New York's enforcement of fishing laws against plaintiffs ..... 15

2. Plaintiffs' complaint ..... 17

3. Prior appeal in this Court ..... 19

4. Proceedings on remand and summary judgment ..... 20

SUMMARY OF ARGUMENT ..... 23

ARGUMENT ..... 27

**Page**

POINT I

THE DISTRICT COURT CORRECTLY DETERMINED THAT THE CHALLENGED FISHING REGULATIONS ARE VALID UNDER THE CONSERVATION NECESSITY DOCTRINE ..... 27

A. The Challenged Regulations Are Reasonable and Necessary for Conservation. ..... 28

B. Plaintiffs' Claim of Legal Error Is Meritless. ..... 31

C. The District Court Did Not Exceed the Scope of This Court's Mandate in the Prior Appeal. ..... 36

POINT II

THE DISTRICT COURT CORRECTLY DETERMINED THAT PLAINTIFFS FAILED TO CREATE A GENUINE ISSUE OF FACT THAT THEY POSSESS FEDERAL FISHING RIGHTS ..... 43

A. Plaintiffs Failed to Establish Unextinguished Aboriginal Title. ..... 43

B. Plaintiffs Identify No Legal Basis to Assert a Freestanding "Aboriginal Fishing Rights" Claim. ..... 49

C. Even If a Freestanding Fishing Rights Claim Were Cognizable and Not Extinguished Here, Plaintiffs Failed to Demonstrate the Requisite Exclusive Use of the Relevant Areas. ..... 56

POINT III

ALTERNATIVELY, THIS COURT MAY AFFIRM THE JUDGMENT ON THE BASIS OF EQUITABLE DEFENSES RAISED BELOW ..... 59

CONCLUSION ..... 61

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alabama-Coushatta Tribe of Texas v. United States*,
Cong. Ref. No. 3-83, 2000 WL 1013532
(Fed. Cl. June 19, 2000) .......... 52

*Cantor Fitzgerald, L.P. v. Peaslee*,
88 F.3d 152 (2d Cir. 1996) .......... 38

*Cayuga Indian Nation v. Pataki*,
413 F.3d 266 (2d Cir. 2005) .......... 59-60

*City of Sherrill v. Oneida Indian Nation*,
544 U.S. 197 (2005) .......... 59-60

*Confederated Tribes of Chehalis Indian Rsrv. v. Washington*,
96 F.3d 334 (9th Cir. 1996) .......... 7, 50, 53

*County of Oneida v. Oneida Indian Nation*,
470 U.S. 226 (1985) .......... 6-7

*Delmarva Fisheries Ass'n v. Atlantic States Marine Fisheries Comm'n*,
127 F.4th 509 (4th Cir. 2025) .......... 36

*Dow Jones & Co. v. Harrods Ltd.*,
346 F.3d 357 (2d Cir. 2003) .......... 41

*E.I. Dupont de Nemours & Co. v. Invista B.V.*,
473 F.3d 44 (2d Cir. 2006) .......... 40

*Giannullo v. City of New York*,
322 F.3d 139 (2d Cir. 2003) .......... 9, 30

*Herrera v. Wyoming*,
587 U.S. 329 (2019) .......... 7

*Holcomb v. Confederated Tribes of Umatilla Indian Rsrv.*,
382 F.2d 1013 (9th Cir. 1967) .......... 35

**Cases** **Page(s)**

*In re Wilson*,
30 Cal.3d 21 (1981) ........................................................................ 51

*Johnson v. M'Intosh*,
21 U.S. (8 Wheat.) 543 (1823)........................................................ 6, 52

*Lipan Apache Tribe v. United States*,
180 Ct. Cl. 487 (1967) ........................................................................ 52

*LoSacco v. City of Middletown*,
71 F.3d 88 (2d Cir. 1995) .................................................................. 42

*Mescalero Apache Tribe v. Jones*,
411 U.S. 145 (1973)............................................................................. 4

*Metlakatla Indian Cmty. v. Dunleavy*,
736 F. Supp. 3d 741 (D. Alaska 2024) ............................................. 52

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999)........................................................... 5, 8, 28, 32

*Mitchel v. United States*,
34 U.S. 711 (1835)......................................................... 7, 44, 46, 52

*Native Vill. of Eyak v. Blank*,
688 F.3d 619 (9th Cir. 2012)............................................... 54-55, 57

*New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*,
352 F.3d 599 (2d Cir. 2003) ............................................................... 37

*New York v. Shinnecock Indian Nation*,
523 F. Supp. 2d 185 (E.D.N.Y. 2007)................................ 23, 45-47, 49

*New York v. Smith*,
No. 08-cv-4422, 2009 WL 2390809 (E.D.N.Y. July 31, 2009) ............ 15

*New York v. Smith*,
No. 09-cv-2221, 2011 WL 2470065 (E.D.N.Y. June 17, 2011) ........... 16

**Cases** **Page(s)**

*Niagara Mohawk Power Corp. v. Jones Chem., Inc.*,
315 F.3d 171 (2d Cir. 2003) ........................................................ 35

*Oneida Indian Nation v. County of Oneida*,
617 F.3d 114 (2d Cir. 2010) ........................................................ 59

*Oneida Indian Nation v. New York*,
691 F.2d 1070 (2d Cir. 1982) ........................................................ 6

*Oneida Indian Nation v. New York*,
860 F.2d 1145 (2d Cir. 1988) ........................................................ 44

*Oneida Indian Nation v. Oneida Cnty.*,
414 U.S. 661 (1974) ........................................................ 44

*Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*,
473 U.S. 753 (1985) ........................................................ 7

*Organized Vill. of Kake v. Egan*,
369 U.S. 60 (1962) ........................................................ 4

*Paddington Partners v. Bouchard*,
34 F.3d 1132 (2d Cir. 1994) ........................................................ 39

*People of Vill. of Gambell v. Hodel*,
869 F.2d 1273 (9th Cir. 1989) ........................................................ 54

*Pueblo of Jemez v. United States*,
790 F.3d 1143 (10th Cir. 2015) ........................................................ 52

*Puricelli v. Republic of Argentina*,
797 F.3d 213 (2d Cir. 2015) ........................................................ 37

*Puyallup Tribe, Inc. v. Department of Game*,
433 U.S. 165 (1977) ........................................................ 31

*Puyallup Tribe v. Department of Game*,
391 U.S. 392 (1968) ........................................................ 8, 28, 33-34

**Cases** **Page(s)**

*Sac & Fox Tribe of Indians v. United States*,
383 F.2d 991 (Ct. Cl. 1967) .......... 52, 56

*Seneca Nation of Indians v. New York*,
382 F.3d 245 (2d Cir. 2004) .......... 44

*Shinnecock Indian Nation v. New York*,
628 F. App'x 54 (2d Cir. 2015) .......... 60

*Silva v. Farrish*,
47 F.4th 78 (2d Cir. 2022) .......... 19-20, 37, 40

*Sohappy v. Smith*,
302 F. Supp. 899 (D. Or. 1969) .......... 34

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
762 F.3d 165 (2d Cir. 2014) .......... 37-38

*Tee-Hit-Ton Indians v. United States*,
348 U.S. 272 (1955) .......... 6, 52, 54

*Tulee v. Washington*,
315 U.S. 681 (1942) .......... 5, 33

*United States v. Abouselman*,
976 F.3d 1146 (10th Cir. 2020) .......... 52

*United States v. Adair*,
723 F.2d 1394 (9th Cir. 1983) .......... 52

*United States v. Confederated Tribes of Colville Indian Rsrv.*,
606 F.3d 698 (9th Cir. 2010) .......... 52

*United States v. Kabinto*,
456 F.2d 1087 (9th Cir. 1972) .......... 6

*United States v. Michigan*,
471 F. Supp. 192 (W.D. Mich. 1979) .......... 52

**Cases** **Page(s)**

*United States v. Minnesota*,
466 F. Supp. 1382 (D. Minn. 1979) .......... 7, 50

*United States v. Oregon*,
718 F.2d 299 (9th Cir. 1983) .......... 34

*United States v. Pueblo of San Ildefonso*,
513 F.2d 1383 (Ct. Cl. 1975) .......... 52

*United States v. Santa Fe Pac. R. Co.*,
314 U.S. 339 (1941) .......... 6, 52

*United States v. Seminole Indians*,
180 Ct. Cl. 375 (1967) .......... 52

*United States v. Winans*,
198 U.S. 371 (1905) .......... 5, 32, 52

*Unkechaug Indian Nation v. New York State Dep't of Env't Conservation*,
677 F. Supp. 3d (E.D.N.Y. 2023) .......... 31

*Unkechaug Indian Nation v. Seggos*,
126 F.4th 822 (2d Cir. 2025) .......... 58

*Vidal v. Annucci*,
No. 22-2729, 2024 WL 1003532 (2d Cir. Mar. 8, 2024) .......... 39

*Wahkiakum Band of Chinook Indians v. Bateman*,
655 F.2d 176 (9th Cir. 1981) .......... 7, 53

*Washington State Dep't of Licensing v. Cougar Den, Inc.*,
586 U.S. 347 (2019) .......... 8, 28

*Western Shoshone Nat'l Council v. Molini*,
951 F.2d 200 (9th Cir. 1991) .......... 50-51

**Statutes** **Page(s)**

*Federal*

16 U.S.C.
§ 5101 et seq. .......... 11
§ 5102 .......... 11
§ 5104 .......... 11, 36
§ 5106 .......... 11, 36

*State*

Environmental Conservation Law
§ 13-0316 .......... 16
§ 13-0319 .......... 16
§ 13-0335 .......... 17
§ 71-0923 .......... 17

Penal Law § 10.00 .......... 17

**Regulations**

*State*

6 N.Y.C.R.R.
§ 10.1 .......... 15
§ 40.1 .......... 15-16

**Miscellaneous Authorities**

Andrew P. Richards, *Aboriginal Title or the Paramountcy Doctrine? Johnson v. Mcintosh Flounders in Federal Waters Off Alaska in Native Village of Eyak v. Trawler Diane Marie, Inc.*, 78 Wash. L. Rev. 939 (2003) .......... 54-55

**Miscellaneous Authorities** **Page(s)**

*Cohen's Handbook of Federal Indian Law* (Nell Jessup Newton & Kevin K. Washburn eds.) (2024 update)
§ 2.10 .......... 58
§ 18.02 .......... 6
§ 20.01 .......... 4-5
§ 20.03 .......... 4

## PRELIMINARY STATEMENT

This case concerns whether plaintiffs, three individual members of the Shinnecock Indian Nation, a Native American tribe in Eastern Long Island, must observe state wildlife protection laws while fishing outside of their reservation, in New York state waters, for baby eels and certain other undersized fish. Plaintiffs sued officers of the New York State Department of Environmental Conservation and of the Suffolk County District Attorney's Office in the U.S. District Court for the Eastern District of New York, seeking a declaration that they possess aboriginal fishing rights that supersede state law, seeking to enjoin the enforcement of state laws against them for harvesting baby eels and other undersized fish, and seeking monetary damages for blocking their participation in the lucrative baby eel market. The officers of the Suffolk County District Attorney's Office have since been dismissed from the case.

In a prior appeal, this Court affirmed the dismissal of plaintiffs' claims for monetary damages, vacated the dismissal of plaintiffs' claims for declaratory and injunctive relief, and remanded for further proceedings. On remand, the parties conducted discovery and cross-moved for summary

judgment. The district court (Brown, J.) granted summary judgment to defendants.

This Court should affirm. First, the district court correctly determined that defendants were entitled to summary judgment under the conservation necessity doctrine. Defendants presented uncontroverted expert evidence that the minimum catch size and other restrictions challenged here are reasonable and generally applicable laws that are necessary for environmental conservation. There was thus no dispute of fact that the challenged restrictions apply to plaintiffs when fishing in state waters, outside of their reservation's boundaries, notwithstanding any federal fishing rights they might have.

Second, the Court can affirm on the independent ground that plaintiffs did not establish that they have any federal fishing right that would immunize them from state laws when fishing in state waters outside of the Shinnecock Reservation, as the district court correctly held. Plaintiffs expressly disavowed any claim that their alleged federal fishing rights had been reserved by any federal treaties or other instruments. As a result, they needed to establish that the tribe has fishing rights as an aspect of unextinguished "aboriginal title"—a federal common

law right of possession and occupancy to ancestral lands. Plaintiffs failed to do so, because land deeds plainly extinguished any aboriginal title the tribe might have had over the area at issue. Plaintiffs' novel claim that they can bring a freestanding aboriginal fishing rights claim, independent of reserved rights or aboriginal title, lacks any basis in law and would fail on the merits in any event.

Last, even if plaintiffs had some basis for their asserted federal fishing rights, equitable principles would at this point bar them from asserting those rights, which disrupt long-settled expectations about the State's management of its navigable waters.

## ISSUES PRESENTED

1. Whether the district court properly granted summary judgment to defendants based on conservation necessity.

2. In the alternative, whether the district court properly granted summary judgment to defendants based on plaintiffs' failure to establish unextinguished aboriginal title.

3. In the alternative, whether this Court can affirm the judgment on the basis of equitable defenses raised below.

## STATEMENT OF THE CASE

### A. Legal Background

It is well settled that, absent federal law to the contrary, Native Americans "going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973). Thus, States generally may apply their state fishing laws to tribal members fishing outside of their reservations and in state waters.[1] *See Organized Vill. of Kake v. Egan*, 369 U.S. 60, 75-76 (1962). However, if a tribe establishes that it possesses *federal* fishing rights, those federal rights may, in some circumstances, preempt state fishing laws, even in off-reservation waters. *See Cohen's Handbook of Federal Indian Law* § 20.03(3)(b) (Nell Jessup Newton & Kevin K. Washburn eds.) (2024 update) (Lexis).

Courts have recognized two legal pathways by which tribes can establish that they possess federal off-reservation fishing rights that may have preemptive effect. *See id.* § 20.01. Under the first, more common

---

[1] This case does not concern fishing that takes place on the Shinnecock Nation's reservation.

pathway, known as a "reserved-rights" claim, a tribe may establish that its federal fishing rights are expressly reserved in a federal document, such as a treaty, executive order, or other written instrument.[2] *Id.* § 20.01(3). The reserved-rights pathway is not relevant to this case, however, because plaintiffs disclaim that the source of their aboriginal fishing rights is grounded in any treaty, agreement, or other historical document. (*See* Pls.' Resp. Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. and in Further Supp. of Pls.' Mot. for Summ. J. at 8 (June 13, 2025), ECF No. 162-33 ("Pls.' MSJ Opp'n") at 8.)

In the second, less common pathway, a tribe may establish that it possesses federal fishing rights as an aspect of the tribe's "aboriginal title" to territory. *See Cohen's Handbook of Federal Indian Law* § 20.01(2). "Aboriginal title" is a federal common law right to the possession and use of land that was historically occupied and used exclusively by that tribe.

---

[2] Reserved rights claims represent the overwhelming number of off-reservation fishing rights cases that have reached the U.S. Supreme Court. *See, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 176 (1999) (1837 treaty); *Tulee v. Washington*, 315 U.S. 681, 682 (1942) (1855 treaty); *United States v. Winans*, 198 U.S. 371, 377 (1905) (1859 treaty).

*See County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234-35 (1985); *see also Cohen's Handbook of Federal Indian Law* § 18.02(1)(a)(ii).

The Supreme Court has clarified that aboriginal title is "not a property right" but instead an exclusive "right of occupancy" to land, grounded in a tribe's historic and exclusive occupation of defined territory. *See Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955); *accord United States v. Kabinto*, 456 F.2d 1087, 1091 (9th Cir. 1972); *see Johnson v. M'Intosh*, 21 U.S. (8 Wheat.) 543, 573-74 (1823). The sovereign can extinguish aboriginal title at any time, without any legally enforceable obligation to pay just compensation.[3] *Tee-Hit-Ton Indians*, 348 U.S. at 279. To establish rights based on aboriginal title, a tribe must show that its aboriginal title is still good and has not been extinguished by the sovereign. *See United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 345 (1941). Extinguishment can occur in multiple ways,

---

[3] Prior to the American Revolution, the sovereign was the discovering European Nation (here, the Kingdom of England, which became Great Britain). *Oneida Indian Nation v. New York*, 691 F.2d 1070, 1075 (2d Cir. 1982). After the Revolution, the sovereign became the original States and, after the ratification of the U.S. Constitution, the United States. *Id.* (quoting *Oneida Indian Nation v. Oneida Cnty.*, 414 U.S. 661, 667 (1974)).

including (as relevant here) where the tribe sells its territory to third parties and those sales are ratified by the sovereign. *See County of Oneida*, 470 U.S. at 234; *Mitchel v. United States*, 34 U.S. 711, 727-28 (1835).

Federal common law treats aboriginal fishing rights as "incidents of Indian title, not rights separate from Indian title." *United States v. Minnesota*, 466 F. Supp. 1382, 1385 (D. Minn. 1979), *aff'd sub nom., Red Lake Band of Chippewa Indians v. Minnesota*, 614 F.2d 1161 (8th Cir. 1980). Accordingly, extinguishment of aboriginal title also terminates a tribe's fishing rights, unless those rights are separately reserved in a treaty or other instrument. *See Confederated Tribes of Chehalis Indian Rsrv. v. Washington*, 96 F.3d 334, 341 (9th Cir. 1996); *Wahkiakum Band of Chinook Indians v. Bateman*, 655 F.2d 176, 180 n.12 (9th Cir. 1981).

Where a tribe possesses federal fishing rights under either a reserved-rights claim or unextinguished aboriginal title, federal law nevertheless empowers a State to apply its generally applicable, reasonable state laws that are necessary for conservation to regulate tribal fishing on off-reservation lands. *Herrera v. Wyoming*, 587 U.S. 329, 339 (2019); *see also Oregon Dep't of Fish & Wildlife v. Klamath Indian*

*Tribe*, 473 U.S. 753, 765 n.16 (1985). The Supreme Court has "repeatedly reaffirmed" this "conservation necessity" principle. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 205 (1999) (quotation marks omitted).

To satisfy conservation necessity, a State must show that its regulations (i) do "not discriminate against the Indians," *Puyallup Tribe v. Department of Game* (*Puyallup I*), 391 U.S. 392, 398 (1968), and (ii) "are necessary for the conservation of fish," *Washington State Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347, 366 (2019) (quotation marks omitted). Permissible regulations may include "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like." *Puyallup I*, 391 U.S. at 398. Plaintiffs agree that the "conservation necessity standard is analogous to the standard employed by this Court in" cases involving federally issued fishing permits, specifically, that States may impose "reasonable, nondiscriminatory conservation and environmental protection measures otherwise within their police power." (Pls.' MSJ Opp'n at 28 n.9 (quotation marks omitted).)

## B. Factual Background[4]

### 1. The Shinnecock Indian Nation's ceded lands

Since before the arrival of the Europeans, the Shinnecock Indian Nation has inhabited a particular and defined territory that is roughly coextensive with the Town of Southampton, Long Island. This territory, on the southern fork of Long Island, is situated between (a) the ancestral lands of the Montauketts to the east, on the eastern end of the southern fork, and (b) the ancestral lands of the Unkechaugs to the west, spanning the island from north to south, west of the place where the island forks. (Joint Appendix (J.A.) 1229.)

From 1640 to 1666, representatives of the Shinnecock Indian Nation, along with representatives of the Montauketts and other tribes, entered into a series of agreements in which the Shinnecocks sold their ancestral territory to European settlers. For example, in 1640, the founders of the Town of Southampton secured a deed from the resident

[4] Unless otherwise stated, all facts in this section come from stipulated or uncontroverted facts in defendants' Local Rule 56.1 statement (Joint Appendix (J.A.) 1200-1268 (plaintiffs' response to defendants' 56.1 statement)). *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

Native Americans, including the Shinnecocks, for a tract of land covering the eastern half of the Shinnecock Bay—namely, lands between the present-day Shinnecock Canal and the present-day Wainscott plain (the border with present-day East Hampton). (J.A. 1231-1232.) In four subsequent deeds, various Shinnecock leaders sold to English settlers tracts of lands running west from the Shinnecock Canal to the present-day boundary with the Town of Brookhaven. (J.A. 1235-1239, 1241-1244.) Collectively, these sales encompassed the lands constituting present-day Southampton, which includes the Shinnecock Bay.

Between 1666 and 1686, representatives of the discovering sovereign—namely, the Kingdom of England—repeatedly ratified these sales and confirmed that all right, title, and interest in the ceded lands was vested in the trustees of the Town of Southampton. In 1683, royal Governor Thomas Dongan embarked on a project to reconcile and reissue royal patents recognizing title to the lands of Long Island, including those that were the subject of competing land claims between Native Americans and English subjects. In 1686, Governor Dongan issued a royal patent confirming the boundaries of the Town. The patent stated that Governor Dongan had "examined the matter in variance between the ffreeholders

of the said Towne of Southampton and the Indyans" and found that "all the Indyan right" had, by virtue of the prior sales of land to the Town, been "invested into the ffreeholders of the Towne of Southampton aforesaid." (J.A. 1252-1253.)

### 2. The state-federal regulatory framework protecting the American eel and other species

New York is a member of the Atlantic States Marine Fisheries Commission (ASMFC), which is established under federal law. *See* 16 U.S.C. § 5101 et seq. The fifteen States along the Eastern Seaboard that make up the ASMFC act under congressional authority to manage aquatic species within their jurisdictions through species-specific fishery management plans. *Id.* § 5104(a); *see id.* § 5102(1)-(2). Under federal law, all member States covered by a fishery management plan for a species must implement the required plan provisions into state law. *Id.* § 5104(b). If a member State does not comply with a fishery management plan, the U.S. Secretary of Commerce is authorized to shut down that State's fishery. *Id.* § 5106(c). (*See* J.A. 1189-1191, 1216-1218.)

The ASMFC currently manages multiple species of fish, including, as most relevant here, American eel, scup (porgy), summer flounder, and

tautog (blackfish), through multistate fishery management plans. A foundational goal of these plans is to achieve long-term, sustainable, productive fisheries by preventing overfishing. (J.A. 1186-1187, 1189.) The ASMFC's fishery management plans use scientific surveys and quantitative models informed by decades of survey, harvest, and biological data to estimate the size of a species' population and how much can safely be fished on an annual basis. (J.A. 1188.) In addition to managing the level of fishing that can sustainably occur on an annual basis, fishery management plans often include additional measures aimed at protecting species reproduction, including protections for juvenile fish and for spawning seasons. (J.A. 1187-1188.) These protective measures can include "species specific size limits, possession limits, and open/closed fishing seasons." (J.A. 1189.)

### 3. The American eel and its decline

American eel play a vital role in the marine ecosystem of the American East Coast. (*See* J.A. 1210.) American eel spawn and hatch in the Sargasso Sea, an area in the Atlantic Ocean near Bermuda. (*See* J.A. 1211.) Within a year of hatching, the eel metamorphose into "glass eels," which are about two to three inches long and have transparent

skin. (J.A. 1212; *see also* J.A. 939, 1191.) Glass eels migrate on tidal currents from ocean waters to coastal estuaries and, eventually, to fresh waters.[5] (*See* J.A. 1212.) After spending several years in fresh water, glass eels metamorphose into "yellow eels" and, after several more years, into "silver eels" that return to the Sargasso Sea to spawn. (J.A. 1212-1213.)

In the 1990s, fisheries scientists observed a decline in the American eel population due to, among other things, a lucrative overseas trade for glass eels. (*See* J.A. 1220-1221.) Because eels cannot be bred in captivity, eel aquaculture farms—the majority of which are in Asia—rely entirely on wild-caught glass eels to stock their farms. Prices for wild-caught glass eels have reached over $2,000 per pound. (*See* J.A. 1220.) Glass eels are also relatively easy to catch en masse; individuals can catch hundreds or thousands of glass eels by dipping or staking nets into the bottom of coastal tributaries. (*See* J.A. 1212, 1222; *see, e.g.*, J.A. 1204; *see also*

---

[5] At this stage, glass eels technically metamorphose into "elvers," which are baby eels that have begun to develop pigmentation. (J.A. 1191, 1212.) For ease of reference, and in keeping with colloquial usage (*see, e.g.*, J.A. 941), this brief uses the term "glass eels" to refer to all juvenile eels, including glass eels and elvers.

J.A. 1191.) The combination of high prices and easy harvest is a potent encouragement to poaching.

In 1999, the ASMFC adopted a fishery management plan for the American eel, with the goal "to conserve and protect the American eel resource." (J.A. 1223 (quotation marks omitted).) The plan required member States, including New York, to prohibit the possession of any eel less than six inches in length.[6] (J.A. 1224.) These prohibitions necessarily banned the harvest of glass eels, which are less than six inches in length. (*See* J.A. 1212.)

In 2012, a peer-reviewed scientific assessment by the ASMFC found the American eel population was depleted and that there were significant downward trends in multiple surveys along the Atlantic coast. (J.A. 1225.) After reviewing the assessment, the ASMFC amended the plan to, among other things, prohibit the possession of any eel less than nine inches in length. (J.A. 1226.) As required by federal law, the New York State Department of Environmental Conservation (DEC) adopted the amended

[6] The plan grandfathered in preexisting glass eel fisheries in four States, only two of which (South Carolina and Maine) operate today. (J.A. 1224.)

fishery management plan provisions into state law. *See* 6 N.Y.C.R.R. §§ 10.1(a)-(b), 40.1(b)(1), (e) (table), (h) (table). If the ASMFC had not implemented these measures, an unregulated eel fishery and loss of habitat likely would have resulted in a population collapse. (J.A. 1228.)

Notwithstanding these conservation efforts, scientific assessments continue to show that the population of American eel has declined and continues to be depleted as of 2023. (*See* J.A. 1228-1229.)

## C. This Case

### 1. New York's enforcement of fishing laws against plaintiffs

Plaintiffs Gerrod Smith, Jonathan Smith, and David Silva are members of the Shinnecock Indian Nation. (J.A. 1203.) In October 2008, Gerrod Smith was charged by the Suffolk County District Attorney, based on allegations made by DEC officers responsible for enforcing New York's environmental conservation laws, with possession of undersized summer flounder, undersized blackfish, and out of season porgy. (*See* J.A. 33.) *See* 6 N.Y.C.R.R. § 40.1(b)(1)(i)-(ii), (e) (table); *New York v. Smith*, No. 08-cv-4422, 2009 WL 2390809, at *1 (E.D.N.Y. July 31, 2009). In October 2009, the charges were dismissed. (J.A. 33.)

In December 2008, Jonathan Smith was charged by DEC in a state civil enforcement action with operating a shellfish farm without a license, and charged by the Suffolk County District Attorney's Office in a state prosecution for using improper shellfish tags. (*See* J.A. 33.) *See* Environmental Conservation Law §§ 13-0316(2), 13-0319; *New York v. Smith*, No. 09-cv-2221, 2011 WL 2470065, at *1 (E.D.N.Y. June 17, 2011), *aff'd*, 494 F. App'x 138 (2d Cir. 2012). Both the civil and criminal charges were subsequently dismissed for failure to prosecute. (J.A. 33.) *See People v. Smith*, No. 09-cv-571 (E.D.N.Y. 2010), ECF Nos. 1, 4, 5, 7.

In April 2017, plaintiff David Silva was stopped by two DEC officers while fishing for glass eels using a seventy-eight-foot-long graduated net (called a "fyke net") in Taylor Creek, a body of water outside of the Shinnecock Reservation. (J.A. 1204, 1208; *see* J.A. 939.) DEC officers also observed a bucket containing approximately 250 glass eels, with nearly 100 more eels in the fyke net. (J.A. 1204; *see* J.A. 941, 943.) Silva's eels, net, and other fishing equipment were seized, and Silva was issued an appearance ticket alleging the offense of possession of undersized eels in violation of New York State law. (J.A. 1205; *see* J.A. 33, 941.) *See* 6 N.Y.C.R.R. § 40.1(b)(1)(ii). Silva was later charged by the Suffolk County

District Attorney's Office with possession of undersized eels and two related violations.[7] (J.A. 1205; *see* J.A. 943.) *See* Environmental Conservation Law §§ 13-0335, 71-0923.

Silva moved to dismiss the charges, claiming that DEC lacked jurisdiction because he was fishing in an area of retained tribal fishing rights. (J.A. 1205-1206.) The Town Justice Court (Weber, J.) denied the motion. (*See* J.A. 1209.) Silva was eventually found guilty of using a fyke net and of fishing without a marine commercial food fishing license. (J.A. 945, 1209.)

### 2. Plaintiffs' complaint

In June 2018, approximately two months before Silva's state court trial was set to begin, plaintiffs filed this lawsuit in the Eastern District of New York against DEC, the DEC commissioner, and the two DEC officers who had ticketed Silva for possession of glass eels (collectively, the "State Defendants").[8] (*See* J.A. 29, 33, 36.)

---

[7] Violations are offenses but not crimes under New York law. *See* Penal Law § 10.00(1), (3)-(6).

[8] Plaintiffs also sued the Suffolk County District Attorney's Office and the assistant district attorney who had prosecuted him (collectively,

(*continued on the next page*)

Citing the civil and criminal prosecutions mentioned above, plaintiffs alleged that, over the past decade, they had been ticketed and had their fish and equipment seized for alleged violations of New York's laws involving fishing and raising shellfish. (J.A. 32-33.) Plaintiffs also alleged that, although each of the prosecutions had failed, plaintiffs were in fear of further prosecution if they continued to exercise these same fishing rights, which they alleged were reserved to the Shinnecock Indian Nation by "Colonial Deeds and related documents." (J.A. 31-32 (listing documents).)

Plaintiffs then alleged two claims. *First*, under the Supremacy Clause, plaintiffs alleged that they possessed unrelinquished, aboriginal fishing rights based on colonial land deeds and other documents ceding Shinnecock ancestral territory. (J.A. 34.) *Second*, under 42 U.S.C. §§ 1981 and 1982, plaintiffs alleged that defendants' prior enforcement of state fishing laws against them amounted to an ongoing pattern of illegal racial discrimination. (J.A. 34.) Plaintiffs sought a declaration and injunction enjoining defendants from enforcing state law against Silva in

---

the "County Defendants"). (*See* J.A. 29.) The County Defendants have been dismissed from the case.

the ongoing criminal proceeding and "from otherwise interfering with Plaintiffs' use of the waters, fishing, taking fish, and holding fish and shellfish in Shinnecock Bay and its estuary and other usual and customary Shinnecock fishing waters." (J.A. 35, 37.) Plaintiffs also sought damages "to deter and punish the Defendants for blocking Plaintiffs' participation in the elver eel market during the 2017 and 2018 seasons, plus any future seasons." (J.A. 35.)

### 3. Prior appeal in this Court

In May 2020, a magistrate judge (Locke, J.) issued a report and recommendation granting summary judgment to defendants on threshold grounds of, inter alia, immunity, abstention, and standing, without reaching the merits. (J.A. 50-89.) The district court adopted the report and recommendation in its entirety. (J.A. 90-96.)

Plaintiffs appealed, and this Court affirmed in part, vacated in part, and remanded for further proceedings. *Silva v. Farrish*, 47 F.4th 78, 90 (2d Cir. 2022). The Court held that Eleventh Amendment immunity did not bar plaintiffs' forward-facing claims for declaratory and injunctive relief because plaintiffs' claims were not the equivalent of a quiet title action. *Id.* at 84-86. This Court also held that the abstention doctrine of

*Younger v. Harris*, 401 U.S. 37 (1971), barred only Silva's request to enjoin the state proceeding against him, and did not bar his other claims for forward-looking declaratory and injunctive relief. *Id.* at 88-89. The Court further concluded that, at the pleading stage, plaintiffs had plausibly alleged standing based on past DEC enforcement of specific state fishing laws against them, as well as plaintiff's professed intent to continue fishing in violation of those laws. *Id.* at 86-87. Last, the Court affirmed dismissal of plaintiffs' racial discrimination claims because no evidence in the record permitted an inference of discriminatory intent. *Id.* at 89-90. The Court remanded for further proceedings consistent with its opinion. *Id.* at 90.

#### 4. Proceedings on remand and summary judgment

On remand, plaintiffs retained new counsel, and the parties proceeded to discovery. (*See* J.A. 17.) In support of their affirmative defense of conservation necessity (*see* ECF No. 100 ¶ 29), defendants retained an expert, John D. Maniscalco, Jr., to opine on fisheries management, the need and basis for multi-jurisdictional fishery management plans under the ASMFC, and the life cycle and conservation status of the American eel. (*See* J.A. 180-181, 1184.) Plaintiffs did not retain a rebuttal

expert on conservation necessity. Plaintiffs and defendants each retained a historical expert to offer testimony on the history of the Shinnecock land transactions. (J.A. 180-181.)

During discovery, plaintiffs represented that their aboriginal fishing rights claims were not limited to Long Island. (*See* J.A. 1262-1264.) Instead, plaintiffs claimed that their fishing rights extended to all "waters which fall under NYSDEC's regulatory jurisdiction" (*see* J.A. 133), which includes waters within the entire State, as well as coastal parts of the Atlantic Ocean. (J.A. 1056-1062, 1090-1092, 1095, 1106-1109.)

At the close of discovery, the parties cross-moved for summary judgment. Based on their expert's report and testimony, defendants argued that, even assuming that the Shinnecock Nation possessed federal fishing rights, the conservation necessity doctrine authorized New York to enforce the challenged fishing regulations (governing minimum catch size, quantity, and season) against plaintiffs. (*See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. at 28-32 (June 13, 2025), ECF No. 162-1 ("Defs.' MSJ").) In response, plaintiffs did not offer any evidence on conservation necessity.

Separately, defendants also argued that plaintiffs had identified no basis for their claim of federal fishing rights. During briefing, plaintiffs disclaimed that they were pursuing a reserved-rights claim at all. (Pls.' MSJ Opp'n at 8.) As to aboriginal title, defendants explained that any aboriginal title held by the Shinnecock over their ancestral lands had been extinguished by colonial land deeds ceding those lands to the Town of Southampton and the English Crown's ratification of those title transfers. (Defs.' MSJ at 5-19.) Plaintiffs argued that the documents did not expressly state that they were extinguish fishing rights (Pls.' MSJ Opp'n at 15-27), and that they did not have to establish aboriginal title to land to establish the existence of aboriginal fishing rights (*id.* at 8-14).

The district court granted summary judgment to defendants. (Special Appendix (SPA) 1.) The district court first held that, regardless of any aboriginal title, the summary judgment record established that the conservation necessity doctrine entitled New York to enforce the challenged fishing regulations against plaintiffs. As the district court emphasized, the regulations were nondiscriminatory, reasonable, and necessary for conservation. (SPA 3-5.)

In the alternative, the district court also held that the summary judgment record left no dispute of fact that the Shinnecock Nation lacked fishing rights as an aspect of aboriginal title. (SPA 6.) As the court explained, the land deeds and patents were clear that aboriginal title to ancestral Shinnecock lands had been extinguished. In reaching this conclusion, the court noted that it found persuasive an earlier decision of another district court that had examined the very same land deeds and patents and reached the same conclusion in a different case. (SPA 5-6.) *See New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 265-66 (E.D.N.Y. 2007), *vacated on jurisdictional grounds*, 686 F.3d 133 (2d Cir. 2012).

## SUMMARY OF ARGUMENT

I. Based on the undisputed record, the district court correctly determined that defendants were entitled to summary judgment based on conservation necessity, regardless of whether plaintiffs possess federal fishing rights. Under the conservation necessity doctrine, a state may enforce its nondiscriminatory, generally applicable wildlife protection laws against a tribe, even where the tribe does have federal fishing rights. Here, defendants presented undisputed evidence that New York

manages multiple species, including American eel, summer flounder, blackfish, and porgy, through ASMFC's fishery management plans and the conservation measures therein. The undisputed record further demonstrated that scientists and ecologists establish these plans for the purpose of ensuring the sustainability of the species. Defendants also presented undisputed evidence that the population of American eel is depleted and at historically low levels, and that New York's management measures, including the prohibition on glass eel fishing, operate to prevent population collapse. Plaintiffs offered no evidence to the contrary and thus failed to raise a disputed issue of material fact about the application of the conservation necessity doctrine. Nor did plaintiffs argue that the district court was precluded from considering conservation necessity, or assert that they needed additional discovery before the district court could reach the issue.

Plaintiffs miss the mark in asserting that the district court ignored cases holding that tribal fishing rights may coexist with state management measures. Although that is true for some state laws, laws that are necessary for conservation are a well-recognized exception to this principle. Indeed, that is the point of the conservation necessity doctrine.

And plaintiffs offered no evidence at summary judgment of how their claimed right to harvest glass eels or other juvenile fish were in fact compatible with New York's regulations, which by law must be consistent with those adopted by the ASMFC.

The district court also did not exceed the scope of this Court's mandate in *Silva*, 47 F.4th 78, by ruling on conservation necessity grounds. This Court neither reached the issue of conservation necessity in *Silva* nor precluded consideration of that issue on remand. Plaintiffs and amici cite no case requiring a court to adjudicate tribal rights *before* reaching conservation necessity, and the issue does not present an exception to the settled rule that courts are free to decide issues in the order they see fit.

II. The Court may also affirm on the independent ground that plaintiffs failed to establish that they possessed federal fishing rights. Because plaintiffs disclaimed that they were relying on a reserved-rights theory, they were required to put forward a prima facie case that the Shinnecock Nation possessed unextinguished aboriginal title to some ancestral territory. They failed to do so. As the district court correctly concluded, the uncontroverted record at summary judgment established

that the Nation had ceded its ancestral lands to European settlers, and that the Kingdom of England, as sovereign, had ratified these sales. As a legal matter, these actions confirmed all right, title, and interest in the Town of Southampton. And it is well settled that such extinguishment of aboriginal title terminates a tribe's use and occupancy rights, including fishing rights.

There is no legal basis for plaintiffs' assertion that they can bring a claim for freestanding aboriginal fishing rights in state waters, regardless of aboriginal title to land. Plaintiffs identify no cases in which a tribe has asserted aboriginal fishing rights in this manner, without also identifying a treaty or statute that reserved these rights or identifying some unextinguished aboriginal title.

In any event, even if freestanding aboriginal fishing rights claims were legally cognizable, plaintiffs would be unable to meet the test that they propose for establishing such a right, which would require a tribe to show exclusive use and possession of the waters in which it is claiming fishing rights. Here, plaintiffs failed to make this showing because their own expert explained that the Shinnecock did not use the Shinnecock

Bay or the waters of Long Island exclusively, but instead shared those waters with other tribes.

III. In the alternative, this Court may also affirm on grounds that appear in the record and that defendants raised below, namely, that even if plaintiffs had some basis for their asserted federal fishing rights, equitable principles would at this point bar them from asserting those rights, which disrupt long-settled expectations about the State's management of its navigable waters.

## ARGUMENT

## POINT I

### THE DISTRICT COURT CORRECTLY DETERMINED THAT THE CHALLENGED FISHING REGULATIONS ARE VALID UNDER THE CONSERVATION NECESSITY DOCTRINE

The district court correctly determined that defendants were entitled to summary judgment because the conservation necessity doctrine enables defendants to enforce the challenged state environmental laws against plaintiffs, regardless of whether they possess federal fishing rights. (*See* SPA 4-5.) Defendants put in unrebutted evidence establishing the application of the conservation necessity doctrine here, and

plaintiffs put in no evidence to the contrary that could raise a disputed issue of material fact. Each of plaintiffs' contrary arguments lacks merit.

### A. The Challenged Regulations Are Reasonable and Necessary for Conservation.

The Supreme Court has "repeatedly reaffirmed" that States have the "authority to impose reasonable and necessary nondiscriminatory regulations on Indian hunting, fishing, and gathering rights in the interest of conservation." *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 205. "[T]he manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." *Puyallup I*, 391 U.S. at 398; *see Washington State Dep't of Licensing*, 586 U.S. at 366.

Here, the laws and regulations from which plaintiffs claim immunity are precisely the type of "purely regulatory" fishing restrictions (on size, number, maturity, and season) that the conservation necessity doctrine preserves. At summary judgment, defendants presented extensive, unrebutted expert evidence that New York participates in the ASMFC, which has adopted multistate fishery management plans for American

eel, as well as the other species on which plaintiffs' standing and claims here are based, i.e., summer flounder, scup (porgy), and tautog (blackfish). (*See* J.A. 1186.) Defendants' expert opined that the ASMFC's restrictions are based on scientific surveys that estimate the health of a species, the size of its population, and threats to its sustainability. The expert opined that such surveys factor in reports of harvested and discarded catch by licensed commercial fishermen. The expert further opined that plan requirements such as "species specific size limits, possession limits, and open/closed fishing seasons" are common, ecologically sound management measures that ensure that species stocks are not overfished and remain at sustainable levels. (J.A. 1188-1189.)

As to American eel specifically, defendants' expert explained that the minimum catch sizes and numerical limits had been adopted pursuant to the multistate American eel fishery management plan, in response to scientific surveys showing that the eel species was depleted. (J.A. 1192-1196.) Defendants' expert further testified that, "[i]f the Commission had left management measures for eel unchecked and not implemented" measures such as the nine-inch minimum size limit, "an

unregulated American eel fishery and loss of habitat would likely have resulted in a population collapse." (J.A. 1195.)

Plaintiffs offered no rebuttal expert on conservation necessity and, critically, made no attempt to contravene (much less with admissible evidence) any of the facts proffered by defendants in their Local Rule 56.1 statement about conservation. (*See* J.A. 1209-1229.) Instead, plaintiffs either expressly admitted these facts (*see, e.g.*, J.A. 1217), or denied knowledge or information sufficient to form a belief as to their truth (*see* J.A. 1209-1229), thereby rendering defendants' facts undisputed at summary judgment. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

Nor did plaintiffs argue that defendants had failed to meet their legal burden to prove conservation necessity. (Pls.' MSJ Opp'n at 27-29.) Plaintiffs agreed with defendants that the "conservation necessity standard" allows States to impose "reasonable, nondiscriminatory conservation and environmental protection measures otherwise within their police power." (*Id.* at 28 n.9 (quotation marks omitted).) Accordingly, based on the undisputed factual record, the district court correctly concluded that New York's regulations concerning eels and the other fish

species at issue were both nondiscriminatory and necessary for conservation. (*See* SPA 4-5.) *See Unkechaug Indian Nation v. New York State Dep't of Env't Conservation*, 677 F. Supp. 3d at 157 (E.D.N.Y. 2023), *aff'd sub nom.*, *Unkechaug Indian Nation v. Seggos*, 126 F.4th 822 (2d Cir.), *cert. denied sub nom.*, *Unkechaug Indian Nation v. Lefton*, 146 S. Ct. 113 (2025) (examining same eel fishing regulations and concluding that conservation necessity doctrine applied).

## B. Plaintiffs' Claim of Legal Error Is Meritless.

On appeal, plaintiffs have not challenged the merits of the district court's holding or pointed to evidence in the record that creates a dispute of fact on conservation necessity. *See Puyallup Tribe, Inc. v. Department of Game* (*Puyallup III*), 433 U.S. 165, 177 (1977) (declining to disturb conservation necessity ruling where tribe did not attack lower courts' factual determinations). Instead, plaintiffs claim that the district court committed a legal error by allegedly ignoring that tribal fishing rights are "[f]ully [c]ompatible" with States' management of natural resources. Br. at 24-29. That argument mischaracterizes the law. Although plaintiffs are correct that *non*-conservation-based fishing laws (such a requirement to pay a fee to obtain a fishing license) must sometimes yield to a tribe's

federal fishing rights under the Supremacy Clause, reasonable and necessary conservation-based laws remain enforceable against a tribe. *See Mille Lacs Band of Chippewa Indians*, 526 U.S. at 205. That is the purpose of the conservation necessity doctrine. And here, the laws and regulations from which plaintiffs claim immunity are precisely the type of purely regulatory fishing restrictions (on size, number, maturity, and season) that the conservation necessity doctrine preserves.

Plaintiffs mistakenly rely on cases that concern state actions or regulations that, unlike the DEC regulations challenged here, addressed issues other than conservation. In *United States v. Winans*, for example (cited in Br. at 26), the Supreme Court held that a State's grant to a nontribal business of an exclusive license that essentially allowed it to harvest a river's entire fish run was unlawful because it violated a tribe's federal treaty-based rights to take fish from the river. *See* 198 U.S. 371, 382 (1905). Licensing the unlimited harvesting of fish was plainly not aimed at conservation. Similarly, in *Tulee v. Washington* (cited in Br. at 26-27), the Supreme Court held that a state law requiring all individuals to pay to obtain a fishing license was not justified by conservation interests because the fees were primarily revenue-producing and conser-

vation goals could be accomplished in other ways. *See* 315 U.S. 681, 684 (1942). Notably, however, the *Tulee* Court reaffirmed that the State could still impose "restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish."[9] *Id.*

By contrast, when a state law is reasonable and necessary for conservation, the Supreme Court has affirmed that tribal fishing rights must yield to the state law. In *Puyallup I*, for example, the Supreme Court held that a State's interest in the conservation of salmon could justify a state law banning the use of "set nets" in freshwater rivers and that this generally applicable prohibition could be enforced against tribal members claiming treaty-based fishing rights. 391 U.S. at 401-03. Here, the laws and regulations from which plaintiffs claim immunity are

---

[9] Plaintiffs also devote much of their brief to discussing cases that hold that States do not own the wildlife within their borders and that a State's admission to the Union does not operate to abrogate a tribe's treaty-based hunting and fishing rights by operation of law. *See* Br. at 24-28, 27 n.3. Defendants did not assert either of these theories at summary judgment, the district court's decision does not mention these theories, and they are irrelevant to this appeal. *Contra* Br. of Amicus Curiae United South and Eastern Tribes Sovereignty Protection Fund (USET Br.) at 23-24, 24 n.11.

precisely the kind—regarding "manner of fishing, the size of the take, the restriction of commercial fishing, and the like"—that fall under the conservation necessity doctrine. *See id.* at 398.

Amici are wrong to contend that a species must be endangered or otherwise "imperiled" before the doctrine of conservation necessity can apply. *See* Br. of Amici Curiae National Congress of American Indians and Shinnecock Kelp Farmers (NCAI Br.) at 17-18. Instead, conservation necessity, "properly understood, embraces procedures and practices designed to forestall the imminence of extinction." *United States v. Oregon*, 718 F.2d 299, 305 (9th Cir. 1983); *see also Sohappy v. Smith*, 302 F. Supp. 899, 908 (D. Or. 1969). The Supreme Court has applied the doctrine to fish species that were exploited both commercially and recreationally. *See, e.g.*, *Puyallup I*, 391 U.S. at 396, 400; *see also Sohappy*, 302 F. Supp. at 911 (State empowered to ensure necessary "escapement" of fish from river to spawning grounds but would need to share "harvestable" portion of fish with tribe). And, as amici recognize, "there is record

evidence that the eel species does demand conservation attention."[10] NCAI Br. at 24.

Plaintiffs and amici err in arguing that application of the conservation necessity doctrine is inappropriate because the Shinnecock could hypothetically enter into a state-tribal joint management plan or effectively self-regulate. *See* Br. at 28-29; Br. of Amicus Curiae Mashpee Wampanoag Tribe at 10-16; Br. of Margery Hunter Brown Indian Law Clinic on Behalf of Amici Curiae Great Lakes Indian Fish and Wildlife Commission at 8-10. Speculation that plaintiffs will voluntarily comply with different restrictions that do not yet exist does not suffice to create a triable issue of fact about applicability of the conservation necessity doctrine at summary judgment. *See Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

In any event, plaintiffs do not explain how hypothetical co-management would function legally or in practice. New York is part of

---

[10] One case on which amici rely is inapposite because it involved deer and elk populations that remained "in healthy condition" despite large harvests by sportsmen. *See Holcomb v. Confederated Tribes of Umatilla Indian Rsrv.*, 382 F.2d 1013, 1014 (9th Cir. 1967). Here, the American eel remains depleted despite management measures. (J.A. 1228-1229.)

the ASMFC and, under federal law, lacks discretion to depart from the interstate fishery management plans (including restrictions on catch size) that the Commission has adopted. *See* 16 U.S.C. § 5104(b); *see also id.* § 5106(c). Practically speaking, moreover, the purpose of setting a minimum catch size is to conserve and perpetuate the species. *See, e.g.*, *Delmarva Fisheries Ass'n v. Atlantic States Marine Fisheries Comm'n*, 127 F.4th 509, 511 (4th Cir. 2025). Plaintiffs fail to explain how a hypothetical co-management plan could both allow plaintiffs to exercise their claimed right to fish for glass eels and other undersized fish and also promote conservation.

Accordingly, this Court should affirm the judgment on the ground of conservation necessity.

### C. The District Court Did Not Exceed the Scope of This Court's Mandate in the Prior Appeal.

Plaintiffs are also incorrect to argue that the district court's grant of summary judgment based on conservation necessity exceeded the scope of this Court's mandate in the prior appeal in this case. It is well established that a court does not exceed the scope of this Court's mandate "by addressing on remand an issue that was not decided by this Court in

the original appeal." *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 175 (2d Cir. 2014); *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003).

Here, the prior appeal vacated the district court's initial grant of summary judgment to defendants on immunity, abstention, and standing grounds and did not reach the merits at all, much less the specific issue of conservation necessity. Because conservation necessary (along with all other merits issues) was "left open by the mandate," the district court was free to reach it. *See New England Ins. Co.*, 352 F.3d at 606 (quotation marks omitted); *Sompo Japan Ins. Co. of Am.*, 762 F.3d at 176 (district court did not exceed scope of mandate by considering affirmative defense on remand).

Although a district court cannot consider additional issues when this Court's mandate "limits the issues open for consideration on remand," *Puricelli v. Republic of Argentina*, 797 F.3d 213, 218 (2d Cir. 2015), the mandate in *Silva* contains no such limiting language. Instead, the prior decision simply ordered the case remanded "for further proceedings consistent with this opinion." *Silva,* 47 F.4th at 90. Such language does

not limit the scope of the issues on remand. *See, e.g.*, *Sompo Japan Ins. Co. of Am.*, 762 F.3d at 176.

Plaintiffs and amici also err in suggesting (*see* Br. at 24 n.2; NCAI Br. at 4; USET Br. at 5) that the district court was required to decide their claim of federal fishing rights before deciding defendants' affirmative defense of conservation necessity. Although courts are *permitted* to decide conservation necessity defenses after deciding whether a tribe has federal fishing rights at all, plaintiffs and amici identify no case *requiring* that the issues be decided in that order, and defendants are aware of none. Indeed, it is well settled that, apart from issues implicating subject-matter jurisdiction, courts have broad discretion to decide issues in the order they see fit and to resolve cases on narrow grounds. *See Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152, 157 (2d Cir. 1996).

Here, the issue of federal fishing rights is not a subject-matter jurisdiction question, and the court properly exercised its discretion in deciding the conservation necessity issue first—particularly when that issue was entirely undisputed at summary judgment. Furthermore, plaintiffs have waived any argument that the district court was required to postpone consideration of conservation necessity to a later phase of

trial because they did not make that request below. For example, plaintiffs did not file an affidavit under Rule 56(d) requesting that the Court postpone consideration of the issue until they could obtain further discovery on conservation necessity. *Cf. Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994) (declining to vacate summary judgment where appellant failed to file Rule 56(d) motion); *cf. Vidal v. Annucci*, No. 22-2729, 2024 WL 1003532, at *2 (2d Cir. Mar. 8, 2024) (summary order) (appellant "forfeited his challenge to the denial of additional discovery by failing to file a Rule 56(d) affidavit"). Although plaintiffs observed in passing that courts typically bifurcate the issue of conservation necessity into a separate phase of litigation (*see* Pls.' MSJ Opp'n at 27 n.8), plaintiffs did not move for bifurcation. In any event, if there were any error regarding the order of the issues (and there was not), it would be harmless, as the district court expressly held, in the alternative, that plaintiffs lacked federal fishing rights. (*See* SPA 5-6.) See *infra* at 43-49.

Plaintiffs also appear to argue that this Court's prior decision somehow changed plaintiffs' remaining claims into an abstract right to fish for any species in any manner—rather than claims to fish for American eel and a few other specific species (e.g., summer flounder,

porgy, and blackfish) without adhering to the regulations for those species that DEC had previously enforced against plaintiffs. Plaintiffs appear to base this argument on the portion of this Court's decision affirming dismissal of Silva's request to enjoin the state court proceedings (pursuant to *Younger* abstention) and of plaintiffs' claims for money damages. *See* Br. at 22-23.

But dismissal of those claims did not alter the fact that plaintiffs' standing to bring *any* claims for declaratory and injunctive relief is based on their allegations of injury-in-fact, and those allegations related only to American eels and a few other identified species. Specifically, plaintiffs' standing is based on their having been subject to prior enforcement actions about those specific species in the past and their professed intention to continue to fish in violation of the same regulations. *See Silva*, 47 F.4th at 86-87. (*See also* J.A. 941 (Silva's statement that he had harvested glass eels on multiple occasions).) Plaintiffs plainly lack standing to raise abstract, hypothetical claims about *all* species or *all* of New York's fishing regulations—many of which they may never be subject to, much less intend to violate. *See generally E.I. Dupont de Nemours & Co. v. Invista B.V.*, 473 F.3d 44, 46 (2d Cir. 2006).

Nor can plaintiffs use their claim for declaratory relief to secure entitlement to fishing rights writ large because a declaration that plaintiffs have federal fishing rights would not "finalize the controversy" over whether plaintiffs are immune from the state laws challenged here. *See Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). Indeed, plaintiffs themselves explain that, where a court finds federal fishing rights, it must then decide "the validity of state conservation and management measures relating to the implementation of such rights." *See* Br. at 24 n.2.

There is no merit to plaintiffs' argument that the district court exceeded the mandate by mischaracterizing plaintiffs' remaining claim for declaratory and injunctive relief as a challenge to only New York's American eel regulations. *See id.* at 21-23. The district court did no such thing. It instead stated that the case was about whether plaintiffs "have a right to fish off-reservation free from state regulations that seek to preserve local *fisheries*"; noted that plaintiffs had been prosecuted for fishing for eels, flounder, porgy, blackfish, and shellfish; and observed that New York had "implemented a variety of regulations to protect

aquatic *species*."[11] (SPA 2 (emphasis added).) Although the district court observed that eel regulations were "most relevant to this case" (SPA 2) and devoted the majority of its discussion to eels (SPA 2-4), that is unsurprising given that DEC's most recent prior enforcement action involved eels and plaintiffs' complaint specifically professed their intention to participate in the lucrative market for glass eels in future seasons (*see* J.A. 35). In any event, plaintiffs have abandoned any argument that the district court improperly granted summary judgment as to the non-eel fishing regulations challenged in this lawsuit by failing to mention these other species at all in their appellate brief. *LoSacco v. City of Middletown*, 71 F.3d 88, 92-93 (2d Cir. 1995).

---

[11] Indeed, because there is only one American eel fishery, the district court's use of the term "local fisheries" is a reference to defendants' unrebutted expert evidence regarding the ASMFC's conservation programs and management measures for a variety of species, including not only eels but also summer flounder, blackfish, and porgy. (J.A. 1186, 1189-1190.)

## POINT II

### The District Court Correctly Determined That Plaintiffs Failed to Create a Genuine Issue of Fact That They Possess Federal Fishing Rights

In the alternative, the district court correctly held that plaintiffs failed to create a genuine issue of fact that they possess federal fishing rights by virtue of unextinguished aboriginal title. (*See* SPA 5-6.) As discussed, plaintiffs disclaimed that their rights had been reserved in any federal treaties or other instruments and thus were required to establish a prima facie case that they possessed fishing rights as an aspect of unextinguished aboriginal title. Plaintiffs failed to do so, and their novel claim that they can bring a freestanding aboriginal fishing rights claim independent of a federal treaty or aboriginal title lacks any basis in law.

### A. Plaintiffs Failed to Establish Unextinguished Aboriginal Title.

As the district court properly concluded, plaintiffs failed to raise a genuine issue of material fact that the Shinnecock Indian Nation retained unextinguished aboriginal title to the lands surrounding the Shinnecock Bay. A tribe seeking to establish aboriginal title must show that the tribe has continuously and exclusively possessed the land for a long time, and

that such aboriginal title has not been extinguished by an action of the sovereign, including a sale to private individuals that is ratified by the sovereign. *See Mitchel*, 34 U.S. at 727-28 (confirming validity of colonial-era Native American land sales to private individuals that occurred with Spain's consent); *Seneca Nation of Indians v. New York*, 382 F.3d 245, 249 n.4 (2d Cir. 2004). Prior to the Revolution, the sovereign that held the right to extinguish aboriginal title was the discovering European nation—here, the Kingdom of England. *See Oneida Indian Nation v. Oneida Cnty.*, 414 U.S. 661, 667 (1974); *Oneida Indian Nation v. New York*, 860 F.2d 1145, 1150 (2d Cir. 1988).

Here, the summary judgment record established that any aboriginal title plaintiffs might have had to land in the Town of Southampton, where the Shinnecock Bay is located, was extinguished. The parties agreed at summary judgment that, in the mid-seventeenth century, various Shinnecock tribal leaders or their agents sold the Nation's ancestral lands to either the freeholders of the Town of Southampton collectively or to English settlers individually. (J.A. 1231-1242.) The land sale deeds—the existence, authenticity, and text of which were unchal-

lenged at summary judgment—contained unequivocal language granting the European settlers all right, title, and interest in the land.

For example, in the original 1640 deed to the founders of Southampton, the Shinnecock Tribe conveyed to the Town's founders "all the lands, woods, waters, water courses, eas[e]m[en]ts, profits & emoluments, thence arising whatsoever" in the area "from the place comonly knowne by the place where the Indians hayle over their cannooes out of the North bay to the south side of the Island." (J.A. 953, 1232; *see* J.A. 1233 (deed passed "all our title and interest in the premises, with all emoluments & profits thereto appertaining or any wise *belonging from sea or land* within our Limits above specified" (emphasis added)).) "The use of language such as 'all our right title and interest' is precisely the type of language used when there is an intent to transfer all title in land.'" *See, e.g.*, *Shinnecock Indian Nation*, 523 F. Supp. 2d at 267. And no other deed involving land that ultimately became part of the Town contains any reservation of fishing rights or regulatory jurisdiction by the Shinnecock. (*See, e.g.*, J.A. 1241-1242 (1662 private sale of land in present-day western Southampton by Shinnecock members), 1244 (sale of same land to Town of Southampton by other Tribe members also not reserving

fishing rights).) *See also Shinnecock Indian Nation*, 523 F. Supp. 2d at 266-68 (discussing those deeds).

Although it is true that these deeds by themselves do not operate to extinguish aboriginal title (*accord* Br. at 47-52), defendants also presented uncontroverted evidence that England, as the then-governing sovereign, subsequently ratified these deeds, thereby extinguishing aboriginal title and confirming title to these lands and to the Bay to the Town of Southampton.[12] (*See* J.A. 1250-1255.) *See Mitchel*, 34 U.S. at 746. First, in 1666, a Shinnecock group, seeking to sell a parcel of land west of the Town of Southampton to the town trustees, appealed to then-Governor Richard Nicolls for a determination of their rights in the parcel, which had previously been sold to Captain Thomas Topping by another group of Shinnecock people (via the "Topping Purchase"). (J.A. 1244-1246.)

---

[12] Plaintiffs did not contravene any statements in defendant's Local Rule 56.1 statement regarding these royal determinations and patents (*see* J.A. 1250-1255), and their historical expert did not address them (*see* J.A. 580-611 (expert report), 1054 (expert's testimony that his report did not address these documents); *see also* J.A. 1159-1160 (defendant's expert's observation that plaintiff's expert's report does not mention these documents)). Moreover, amici's assertions that these patents did not resolve any Native American land claims are belied by the record. (*Compare* Br. of Amicus Curiae L. & History Professors in Support of Pls.-Appellants & Reversal at 13-16 ("Professors Br."), *with* J.A. 1253-1255.)

Governor Nicolls determined that "all the right and interest" in the land or beach mentioned in the deeds "doth and shall belong unto the towne of Southampton" and directed the Town to pay "four score fathoms of wampum" for the interest in the land purchased. (J.A. 1246 (quotation marks omitted).) The language Nicolls deployed demonstrated his "plain and unambiguous intent . . . to extinguish the Shinnecock's aboriginal title to the lands of the Topping Purchase . . . and to recognize that those lands were now owned exclusively by the Town, subject to no other rights or interests." *Shinnecock Indian Nation*, 523 F. Supp. 2d at 270.

Subsequent orders issued by New York's colonial governors ratified the conveyances from the Shinnecock Tribe to the Town and confirmed the extinguishment of aboriginal title. In 1676, for example, Governor Edmund Andros issued a patent under royal authority recognizing the Town of Southampton, and its ownership of the land in its general present-day boundaries, including all rivers, lakes, waters, marshes, fishing, "and all other Proffits, Commodities, Emoluments and hereditaments" within those boundaries. (J.A. 1250-1251.)

Then, in 1686, Governor Thomas Dongan issued another patent confirming and reiterating the grants of the Andros patent. (J.A. 1252-

1254.) The 1686 patent responded to a Southampton freeholder's application to confirm tracts and parcels of land and "finally determine the difference between the Indyans and the ffreeholders of the said towne of Southampton." (J.A. 995; *see* J.A. 1253.) And Dongan issued the 1686 patent after eleven Shinnecock members confirmed that they had agreed to and been paid for the 1640 deed. (J.A. 1252-1254.) The 1686 Dongan patent recited that the Governor had

> examined the matter in variance between the ffreeholders of the said Towne of Southampton and the Indyans and do finde that the ffreeholders of the Towne of Southampton aforesaid have lawfully purchased the lands within the Limitts and bounds aforesaid of the Indyans and have payd them therefore according to agreement so that all the Indyan right by virtue of said purchase is invested into the ffreeholders of the Towne of Southampton aforesaid.

(J.A. 1253.) The Dongan patent went on to explicitly grant, ratify, and convey to freeholders and inhabitants of the town, all the "Rivers Rivolets waters lakes ponds Brookes streames beaches . . . Creeks harbors . . . and Easements fishing hawking hunting and fowling" within its boundaries. (J.A. 1254.) The Dongan patent thus "emphasize[d] in clear and unmistakable language the prior extinguishment of the Shinnecock's aboriginal

rights to any and all lands within the bounds of Southampton." *Shinnecock Indian Nation*, 523 F. Supp. 2d at 273.

In response to defendants' uncontroverted evidence, plaintiffs failed to raise a genuine issue of material fact that they retained unextinguished aboriginal title to any lands within the Town of Southampton, including the Bay. Accordingly, the district court properly held that the documents "demonstrate an extinguishment of aboriginal title in present-day South Hampton (which is where Shinnecock Bay is located)."[13] (SPA 5 (quotation marks omitted).)

### B. Plaintiffs Identify No Legal Basis to Assert a Freestanding "Aboriginal Fishing Rights" Claim.

Plaintiffs' only response to the undisputed record is to insist that the land deeds and patents are irrelevant because the deeds and patents never specifically extinguished Shinnecock *fishing rights*, and fishing rights do not depend on aboriginal title. *See* Br. at 44-47, 53-54. Plaintiffs

[13] Contrary to plaintiffs' characterizations, the district court did not treat an earlier decision by another district court as "precedential." *See* Br. at 42. The court here acknowledged that the earlier decision had been vacated on jurisdictional grounds (*see* SPA 5) and observed that the decision's analysis of the same deeds and patents at issue in this case was well reasoned and therefore persuasive (SPA 5-6).

are wrong for two independent reasons. First, plaintiffs misconstrue the deeds and patents. Both the Andros and Dongan patents expressly confirm fishing rights in the Town and extinguish competing rights. (*See* J.A. 1250-1251, 1253-1254.) Those deeds thus expressly extinguish any Shinnecock fishing rights that existed as incident to aboriginal title, even if such express extinguishment was required.

Second, and in any event, the deeds did not need to separately extinguish fishing rights because plaintiffs identify no legal basis to assert their theory of freestanding aboriginal fishing rights. Extinguishment of aboriginal title, including through conveyance of title, "terminates corresponding use and occupancy rights, including fishing rights, except where such rights are expressly or impliedly reserved in a treaty, statute or executive order." *Confederated Tribes of Chehalis Indian Rsrv.*, 96 F.3d at 341; *accord Western Shoshone Nat'l Council v. Molini*, 951 F.2d 200, 202-03 (9th Cir. 1991); *Minnesota*, 466 F. Supp. at 1385. Plaintiffs thus have the rule backwards. It is the *reservation* of fishing rights—not their separate extinguishment—that must be contained or implied in a treaty or other document to establish that any such rights continue after

extinguishment of title. Plaintiffs failed to point to any such reservation of fishing rights in the deeds, a treaty, or any other document.

Both the Ninth Circuit and the California Supreme Court have rejected an argument essentially the same as the one plaintiffs make here. In *Molini*, the Ninth Circuit rejected the Shoshone Nation's request for "'injunctive relief against the interference with hunting and fishing rights that exist independently of aboriginal title.'" 951 F.2d 200, 202 (quoting Shoshone Nation's argument). The Ninth Circuit held that the Nation's aboriginal hunting and fishing rights had been extinguished when aboriginal title was extinguished. *Id.* at 203. Likewise, in *In re Wilson*, the California Supreme Court rejected the petitioner's argument the tribe's aboriginal hunting rights were allegedly "not mere incidents of Indian title" but instead separate rights that could be extinguished only expressly and specifically by Congress. 30 Cal.3d 21, 25 (1981). The court reasoned that the tribe's aboriginal title had been extinguished and that no judicial decision had taken defendant's view that "hunting rights exist in addition to, and as a distinct right separate from aboriginal title." *Id.* at 27 (alteration and quotation marks omitted).

Plaintiffs and their amici misplace their reliance on myriad inapposite cases that each involved either reserved-rights or aboriginal title claims.[14] *See, e.g.*, Br. at 44-49; NCAI Br. at 7-12; USET Br. 18-20. None of these cases support plaintiffs' standalone aboriginal fishing rights claims. For example, in *United States v. Abouselman*, the tribes claimed that they had "aboriginal water rights to the Jemez River in connection *with their aboriginal title*," not as a freestanding right.[15] 976 F.3d 1146, 1152 (10th Cir. 2020) (emphasis added).

---

[14] **Reserved rights.** *See, e.g.*, *Winans*, 198 U.S. at 377; *United States v. Confederated Tribes of Colville Indian Rsrv.*, 606 F.3d 698, 700-02 (9th Cir. 2010); *United States v. Adair*, 723 F.2d 1394, 1399 (9th Cir. 1983); *Metlakatla Indian Cmty. v. Dunleavy*, 736 F. Supp. 3d 741, 746, 755 (D. Alaska 2024); *United States v. Michigan*, 471 F. Supp. 192, 253 (W.D. Mich. 1979), *modified in part*, 653 F.2d 277 (6th Cir. 1981).

**Aboriginal title.** *See, e.g., Santa Fe Pac. R. Co.*, 314 U.S. at 345; *Mitchel*, 34 U.S. at 746; *Johnson*, 21 U.S. (8 Wheat.) at 573-74; *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1147 (10th Cir. 2015); *Sac & Fox Tribe of Indians v. United States*, 383 F.2d 991, 993 (Ct. Cl. 1967); *Alabama-Coushatta Tribe of Texas v. United States*, Cong. Ref. No. 3-83, 2000 WL 1013532, at *1 (Fed. Cl. June 19, 2000); *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383, 1386 (Ct. Cl. 1975); *Lipan Apache Tribe v. United States*, 180 Ct. Cl. 487, 490-91 (1967); *United States v. Seminole Indians*, 180 Ct. Cl. 375, 378 (1967).

[15] Amici's citations to nontribal cases involving property law are also unavailing, as aboriginal title is "not a property right." *Tee-Hit-Ton Indians*, 348 U.S. at 279. Contrary to amici's suggestion (Professors Br.

(*continued on the next page*)

In several of amici's other cases, courts declined to reach the question of whether freestanding off-reservation fishing rights are legally cognizable. For example, in *Wahkiakum Band of Chinook Indians*, the Ninth Circuit rejected plaintiffs' treaty-based reserved rights claims, and then found in the alternative that, even assuming the tribe possessed an aboriginal fishing right, the treaty had extinguished that right. 655 F.2d at 180-81. The court's ruling reflects its understanding that the tribe no longer held title to the lands and was not a signatory to any ratified treaty. *See id.* at 180 n.12. And the court explicitly cautioned that its decision should not be read as endorsing the existence of freestanding aboriginal fishing rights in that situation. *See id.*; *see also Confederated Tribes of Chehalis Indian Rsrv.*, 96 F.3d at 342 (rejecting aboriginal fishing rights claim because fishing rights "had been extinguished with aboriginal title").

Plaintiffs and amici cite several other cases as involving freestanding fishing or water rights claims, but they are mistaken. *See* Br. at 20-21,

at 1, 5), fishing or other use rights that are an aspect of aboriginal title are not themselves standalone property rights—much less standalone property rights with preemptive force under the Supremacy Clause.

46-47; NCAI Br. at 9 n.4. For example, in *People of Village of Gambell v. Hodel*, the plaintiff tribes claimed subsistence fishing rights in the Outer Continental Shelf that were reserved by federal statute or, in the alternative, "derived from common law." 869 F.2d 1273, 1275 (9th Cir. 1989). The tribes were not asserting a freestanding claim for aboriginal fishing rights independent of aboriginal title. Instead, they asserted fishing rights as an aspect of their "claims of aboriginal title" to the submerged lands comprising the Outer Continental Shelf. *See* Br. for Pet'rs, *Amoco Prod. Co. v. People of Vill. of Gambell,* 480 U.S. 531 (1987) (No. 85-1239), 1986 WL 727424, at *4.[16] The Ninth Circuit's observation that the tribes were claiming "a right to occupy and use, rather than title to, the [Outer Continental Shelf]," *Hodel*, 869 F.2d at 1276 n.3, is merely a recognition of the settled rule that aboriginal title is a possessory interest, *see Tee-Hit-Ton Indians*, 348 U.S. at 279.

*Native Village of Eyak v. Blank*, 688 F.3d 619 (9th Cir. 2012), another case involving fishing rights in the Outer Continental Shelf,

---

[16] *See also* Andrew P. Richards, *Aboriginal Title or the Paramountcy Doctrine? Johnson v. Mcintosh Flounders in Federal Waters Off Alaska in Native Village of Eyak v. Trawler Diane Marie, Inc.,* 78 Wash. L. Rev. 939, 956-60 (2003) (describing *Gambell* litigation).

similarly fails to support plaintiffs' theory of freestanding aboriginal fishing rights. The plaintiffs in *Eyak* appear to have proceeded mainly under the theory that federal statutes implicitly reserved their aboriginal fishing rights in the Outer Continental Shelf when Congress extinguished the villages' exclusive rights within Alaska.[17] Appellants' Opening Br., *Native Vill. of Eyak v. Locke*, 688 F.3d 619 (Nos. 09-35881, 02-36155) (9th Cir. 2012), 2010 WL 5078973, at *37-41. That is a theory of rights reserved by statute, not of standalone aboriginal fishing rights. Moreover, to the extent that the plaintiffs were proceeding under an alternative theory of standalone aboriginal fishing rights, the Ninth Circuit affirmed the district court's ruling that the tribe was unable to establish the historical existence of these rights at all, and the court therefore did not need to decide whether plaintiffs could assert such rights without continuing to hold aboriginal title to any lands. *See Native Vill. of Eyak*, 688 F.3d at 622-23.

In addition to lacking any legal basis, plaintiffs' theory of standalone aboriginal fishing rights, separate from aboriginal title, would render the

---

[17] *See* Richards, *supra*, at 962.

reserved-rights doctrine largely superfluous. The purpose of the reserved-rights doctrine is to protect fishing or other use rights that a sovereign and tribe agreed to reserve in treaties or other documents when undertaking acts that extinguished the tribe's aboriginal title. But if free-floating aboriginal use rights continued on after aboriginal title was extinguished, then there would be no need to reserve rights in treaties or other documents. The persistence of the reserved-rights doctrine is strong evidence that without a treaty or statute, aboriginal fishing rights do not survive after title is extinguished.

### C. Even If a Freestanding Fishing Rights Claim Were Cognizable and Not Extinguished Here, Plaintiffs Failed to Demonstrate the Requisite Exclusive Use of the Relevant Areas.

In the alternative, even if a freestanding aboriginal fishing rights claim could be cognizable and had not been extinguished, plaintiffs would not meet the test that they propose for establishing such rights. Plaintiffs propose (*see* Br. at 29) that establishing the existence of aboriginal fishing rights requires applying the same test for establishing aboriginal title to land, i.e., "actual, exclusive, and continuous use and occupancy" of the claimed area "for a long time." *Sac & Fox Tribe of Indians v. United*

*States*, 383 F.2d 991, 998 (Ct. Cl. 1967) (quotation marks omitted). But plaintiffs did not—and could not—establish at summary judgment that they can satisfy that test. They failed to establish that the Shinnecock used Long Island waters, including the Atlantic Ocean, "to the *exclusion* of other Indian groups." *Native Vill. of Eyak*, 688 F.3d at 623 (emphasis in original).

To the contrary, plaintiffs' expert's report contains multiple examples of use of these waters by other tribes. For example, the report states that the 1659 deed for beach property on the Shinnecock Bay "overlapped Unkechaug territory." (J.A. 588.) The report also includes many examples of the Shinnecock sharing marine resources in the Shinnecock Bay, the Great Peconic Bay, and the Atlantic Ocean with neighboring tribes. (*See* J.A. 585-586 (wampum), 587-88 (whale parts), 593-594 (wampum and fishing), 594 (whale carcasses, marine vegetation such as "flags" and "bullrushes"), 598-600 (whaling).) The expert also testified that fishing privileges in Long Island waters were held by "an Algonquin kind of consortium," which would have included the Montauketts and the Unkechaugs. (J.A. 270; *see* J.A. 578.) And there is

no indication that Shinnecock permission was a prerequisite for use of these waters.

Plaintiffs rely on three cases from the Indian Claims Commission[18] to show that this shared use does not defeat their claims of aboriginal title (*see* Br. at 38-39), but they are mistaken. These cases are distinguishable because, in each of those cases, the several villages that shared the lands had been treated as a unified entity by the United States at the time of dispossession and had since coalesced into a unified tribe that was the party seeking compensation before the Commission. Here, by contrast, there is no dispute that the different tribes that shared the waters in Long Island retain separate identities to this day. *See, e.g.*, *Unkechaug Indian Nation v. Seggos*, 126 F.4th 822, 825 (2d Cir.), *cert. denied sub nom., Unkechaug Indian Nation v. Lefton*, 146 S. Ct. 113 (2025). (*See* J.A. 1229.)

---

[18] The Indian Claims Commission was created by Congress in the mid-twentieth century to adjudicate tribal claims for money damages based on treaty violations and dispossession. *See Cohen's Handbook of Federal Indian Law* § 2.10(2).

## POINT III

### ALTERNATIVELY, THIS COURT MAY AFFIRM THE JUDGMENT ON THE BASIS OF EQUITABLE DEFENSES RAISED BELOW

Even if plaintiffs had identified some basis for their asserted fishing rights, equitable principles would bar them from asserting those rights against the State. Both the Supreme Court and this Court have held that the belated assertion of Native American possessory interests in property may be barred under the doctrines of laches, acquiescence, and impossibility. *See City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197, 216-17 (2005); *Cayuga Indian Nation v. Pataki*, 413 F.3d 266, 273-74 (2d Cir. 2005). This doctrine applies here because plaintiffs' claim is "disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief." *Oneida Indian Nation v. County of Oneida*, 617 F.3d 114, 135 (2d Cir. 2010).

In *City of Sherrill*, the Oneida Nation asserted in 2000 that parcels of reservation land sold to non-Native landowners between 1795 and 1805, and repurchased by the Oneida Nation in 1997 and 1998, were exempt from taxes because the original sales violated a 1790 federal law and 1794 federal treaty. 544 U.S. at 202-05. The Supreme Court rejected

the tribe's attempts to litigate the sovereign character of the parcels after two centuries. *Id.* at 214. Likewise, in *Shinnecock Indian Nation v. New York*, this Court applied *Sherrill* to hold that plaintiffs could not litigate their aboriginal title to parcels of land within the Town of Southampton based on a claim that an 1859 indenture conveying the Nation's leasehold interests was invalid under federal law. *See* 628 F. App'x 54, 55 (2d Cir. 2015), *aff'g* No. 05-cv-2887, 2006 WL 3501099, at *3-4 (E.D.N.Y. Nov. 28, 2006).

*Sherrill* bars plaintiffs' suit here. Accepting plaintiffs' theory that they have an unrestricted right to fish in state waters, off their reservation, in violation of state environmental laws, would disrupt long-settled expectations, especially as plaintiffs claim that these rights extend to private property. (*See, e.g.*, J.A. 1113.) *Sherrill* also applies notwithstanding that plaintiffs do not seek exclusive jurisdiction over the claimed waters. As this Court observed in *Cayuga Indian Nation of New York*, "disruptiveness is inherent in the claim itself" rather than in any "particular remedy which would flow from" it. 413 F.3d at 275.

## CONCLUSION

For any of the foregoing reasons, this Court should affirm the district court's grant of summary judgment.

Dated: New York, New York
June 3, 2026

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for State Appellees

By: */s/ Elizabeth A. Brody*
ELIZABETH A. BRODY
Assistant Solicitor General

28 Liberty Street
New York, New York 10005
(212) 416-6167

BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
ELIZABETH A. BRODY
*Assistant Solicitor General*
*of Counsel*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Ava Mortier, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 11,797 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Ava Mortier*